## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

| | | |
|---|---|---|
| J. WAYNE RAIFORD and B, T & R ENTERPRISES, LLC, | * * * | |
| Plaintiffs, | * * | |
| v. | * * | CV 111-152 |
| NATIONAL HILLS EXCHANGE, LLC; SNELLVILLE CROSSING, LLC; RICHARD D. SWOPE; RONALD J. DeTHOMAS; JAMES S. TIMBERLAKE; THOMAS L. ABERNATHY; and STEVEN E. GAULTNEY, | * * * * * * * * | |
| Defendants. | * | |

## O R D E R

Presently pending before the Court are Defendants' motion for summary judgment (doc. no. 48), Plaintiffs' motion to strike Defendants' motion for summary judgment (doc. no. 61), Plaintiffs' motion for a hearing (doc. no. 79), and Plaintiffs' objections to the Magistrate Judge's August 15, 2012 Order denying Plaintiffs' motion to amend (doc. no. 105).

## I.  BACKGROUND

### A. Factual Background

#### 1. The Property

This dispute arises from three transactions involving the National Hills Shopping Center ("Shopping Center" or "Property"). The Property is situated on 16.37 acres located at 2701 Washington Road in Augusta, Georgia.  (Doc. no. 48, Ex. 43.)  The Property is

across the street from the Augusta National Golf Club, which adds intrinsic value as well as parking revenue during the annual Masters Golf Tournament. (Zibilich Dep., Ex. 5 at 8, 11.) The Shopping Center's improvements were originally constructed in 1963, and were substantially renovated between 2008 and 2011. (Doc. no. 48, Ex. 43.) The Shopping Center consists of five noncontiguous buildings totaling approximately 160,000 square feet of leasable space. (Doc. no. 48, Ex. 26.)

The current anchor tenants are The Fresh Market (a grocer), CVS Caremark Corporation ("CVS") (a pharmacy), and Electrolux Home Products, Inc. ("Electrolux") (an appliance manufacturer). (Doc. no. 48, Ex. 43; Zibilich Dep., Ex. 5 at 7, 24.) The two-story building currently leased by Electrolux (and formerly leased to Dillard's as a department store) is approximately 84,000 square feet, or just over half of the gross leasable area in the Shopping Center. (Doc. no. 48, Ex. 26; Jerome Dep., Ex. 1 at 10, 38.)

## 2. *The First Sale of the Property*

On December 29, 2006, Plaintiff B, T & R Enterprises, LLC ("BTR") entered into a contract to sell the Property to Defendant National Hills Exchange, LLC ("NHX"). (Compl., Ex. 1 at 8-40.) BTR's sole member and owner was Plaintiff J. Wayne Raiford ("Raiford").[1] (Doc. no. 80 at 3 n.1.) NHX's members at that time were Defendants Richard D. Swope ("Swope"), Ronald J. DeThomas

---

[1] BTR has since been dissolved, and Raiford has succeeded to all its rights and interests. (Doc. no. 80 at 3 n.1.) Therefore, BTR and Raiford (collectively "Plaintiffs") have the same rights and interests for the purposes of this Order.

("DeThomas"), and Snellville Crossing, LLC.   Snellville Crossing, LLC's members were Defendants Thomas L. Abernathy ("Abernathy"), James S. Timberlake ("Timberlake"), and Steven E. Gaultney ("Gaultney").[2]   (Doc. no. 48, Ex. 20 at 35; Doc. no. 86 at 2.)

Under the Agreement for Purchase and Sale ("Original Agreement"), BTR sold the Property to NHX for $9 million. (Compl., Ex. 1 at 10.)   Under Section 18.2 of the Original Agreement, Raiford was also granted a "Trailing Equity Interest," which constituted a "15% interest in the net equity value of the redeveloped shopping center following closing; provided, however, such interest shall not include voting or management rights with respect to any aspect of the operation of [NHX]."   (Id., Ex. 1 at 25.)   Exhibit K of the Original Agreement provided a hypothetical illustration of how Raiford's Trailing Equity Interest would be calculated following redevelopment and sale of the Shopping Center.   (See id., Ex. 1 at 40.)   Michael Brown ("Brown"), a third party, received a 5% interest in NHX for his role in introducing Raiford and Abernathy, which led to the Original Agreement between BTR and NHX.   (Brown Dep. at 6, 12; Abernathy Dep., Ex. 3 at 33.)

On August 3, 2007, BTR and NHX executed a Second Amendment to the Original Agreement ("Second Amended Agreement"), which changed the purchase price to $8 million in cash and a $1 million promissory note.   (Id., Ex. 1 at 77-80.)   It also substituted the

---

[2] Abernathy, Timberlake, and Gaultney were the managers of NHX.   (Doc. no. 48, Ex. 20 at 8.)   Abernathy, Timberlake, Swope, Gaultney, and DeThomas will be referred to collectively as the "Individual Defendants."

Trailing Equity Interest "in the net equity value of the redeveloped shopping center" found in Section 18.2 of the Original Agreement for "a fifteen (15%) percent equity ownership in [NHX]." (Id.)  NHX's payment of the promissory note and grant of the 15% equity interest to Raiford were both conditioned upon Dillard's vacating the two-story building by January 31, 2010.  (Id.) Pursuant to Section 10 of the Second Amended Agreement, all terms not modified or amended in the Original Agreement remained in full force and effect.  (Id.)  Plaintiffs admit that the Second Amended Agreement was not intended to give Plaintiffs any of the "voting or management rights" which were excluded by Section 18.1 of the Original Agreement.  (Doc. no. 86 at 4.)

On September 11, 2007, the sale closed for $8 million in cash.  (Doc. no. 48, Ex. 23.)  As Dillard's eventually vacated the two-story building within the prescribed time, NHX paid Plaintiffs the amount due under the $1 million promissory note and Plaintiffs were granted the 15% equity ownership of NHX.  (Doc. no. 86 at 4.)

To fund the acquisition and future redevelopment of the Shopping Center, NHX obtained a $16 million loan from Guaranty Bank ("Original Loan").  (Id. at 5.)  The Original Loan agreement and $16 million promissory note were secured by a deed to secure debt on the Property.  (Garcia Dep., Ex. 10 at 1.)  In addition, Abernathy, Timberlake and Gaultney executed guaranties of the Original Loan.  (Id.; Timberlake Aff. ¶ 6.)

4

### 3. *Compass Bank Acquired and Managed the Original Loan*

On August 21, 2009, Guaranty Bank failed.   (Doc. no. 86 at 6.)   Pursuant to a Loss Share Agreement with the Federal Deposit Insurance Corporation ("FDIC"), Compass Bank acquired the Original Loan and related promissory note.   (Garcia Dep. at 8, 15; Timberlake Aff. ¶ 7.)   Under the Loss Share Agreement, Compass Bank would incur 20% of any loss under the Original Loan and the FDIC would incur 80% of any loss.   (Garcia Dep. at 42.)   Certain FDIC Guidelines governed Compass Bank's management and disposition of the Original Loan.   (See id. at 11, 15-19.)

On July 8, 2010, Swope contacted Compass Bank and requested a $1.7 million draw of undisbursed funds from the Original Loan for tenant improvements on the vacant two-story building formerly leased by Dillard's.   (Swope Aff. ¶ 7.)   In response, Compass Bank ordered an appraisal of the Property from Everson Huber & Associates ("Everson Huber").   (Id. ¶ 8.)

On July 26, 2010, Everson Huber issued an appraisal ("July 2010 Appraisal").   (Doc. no. 48, Ex. 26.)   At that time, the Shopping Center was anchored by The Fresh Market and CVS but was still only 26.7% occupied.   (Id.)   The July 2010 Appraisal made the following conclusions regarding the Property's value: (1) the "forced liquidation value," assuming a 90-day liquidation marketing period, was $5.75 million; (2) the "as is" market value[3]

---

[3] Everson Huber's definition of market value was "the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus."

5

was $7.75 million; and (3) the "as stabilized" market value, assuming 100% occupancy of the Shopping Center, was $14 million. (Id.)   In calculating the "as stabilized" value, Everson Huber assumed that the lower floor of the vacant, two-story building would be leased at $5 per square foot (based upon a letter of intent) and that the upper floor would be leased at $3 per square foot.   (Huber Dep. at 10-12.)   After receiving the July 2010 Appraisal, Compass Bank declined NHX's request for tenant improvement funds.[4]   (Swope Aff. ¶ 8.)

### 4. *Compass Bank and NHX Negotiate a Loan Workout*

On August 11, 2010, the Original Loan matured.   (Garcia Dep. at 41, & Ex. 7 at 4.)   At that time, NHX had been current on its loan payments and had an outstanding balance of $14.2 million dollars.   (Id.; Doc. no. 86 at 6.)   On September 29, 2010, Compass Bank sent NHX and the guarantors a notice of default and demanded payment of the outstanding balance.   (Garcia Dep., Ex. 9.)   Linda Garcia ("Garcia"), a Senior Vice President of Compass Bank, became NHX's primary contact.   (Garcia Dep. at 6, 8.)   Garcia informed

---

(Doc. no. 80., Ex. 1 at 78.)   Everson Huber assumed that the buyer and seller are typically motivated, acting in their own best interests, and that reasonable time is allowed for exposure in the open market.   (Id.)   The Everson Huber appraisal determined that a reasonable exposure period in the open market would be twelve months or less if it was aggressively marketed.   (Huber Dep. at 18-19.)   Aggressive marketing in an open market assumed that the Property would be marketed on multiple online services and marketed by several commercial brokers. (Id. at 19-20.)   According to Everson Huber's definitions and assumptions, market value also depends upon an arm's length transaction in which the buyer and seller are not related. (Id. at 21-23.)

[4] On August 9, 2010, NHX and Empire Beauty School executed a letter of intent to lease one of the Shopping Center's buildings, a former movie theater with approximately 8,000 square feet.   (Timberlake Aff. ¶ 17.)   Compass Bank refused to fund tenant improvements, and the deal fell through.   (Id.)   For similar reasons, NHX lost a lease with Firehouse Subs, another prospective tenant.   (Id. ¶ 18; Garcia Dep. at 44-45, & Ex. 8.)

Timberlake that Compass Bank would not fund any more construction costs or tenant improvements. (Doc. no. 48, Ex. 28.) According to Garcia, Compass Bank could not extend the term of the loan, increase lending under the loan, or refinance the loan. (Timberlake Aff. ¶ 19; Garcia Dep. at 14-15.) Compass Bank determined that increasing its commitments would have violated the Loss Share Agreement. (Garcia Dep. at 14-15.)

NHX hired Glass Ratner, a firm experienced in loan workouts, to assist in negotiating an agreement with Compass Bank. (Timberlake Aff. ¶ 21.) NHX also hired Bullock Mannelly Partners ("BMP"), a commercial real estate broker, to look for new sources of debt or equity funding and negotiate a potential loan purchase from Compass Bank. (Id. ¶ 22; Zibilich Dep. at 10, & Ex. 1.)

On November 8, 2010, Timberlake submitted a proposal to Compass Bank offering to provide Compass Bank with a deed in lieu of foreclosure in exchange for a $7.75 million credit toward the outstanding loan balance and an agreement by Compass Bank to sell the Property, post deed in lieu of foreclosure, to an entity designated by NHX for $7.75 million. (Garcia Dep., Ex. 1.) Each of the guarantors would agree to pay deficiency notes totaling $1.25 million. (Id.) The offer was rejected. (Timberlake Aff. ¶ 25.) Compass Bank began to initiate a nonjudicial foreclosure proceeding and submitted a newspaper advertisement in December 2010 for a January 2011 sale. (Garcia Dep. at 12, & Ex. 2.)

Compass Bank also decided to have Everson Huber update the July 2010 Appraisal in conjunction with the upcoming foreclosure sale. (Garcia Dep., Ex. 2.) On November 22, 2010, an Everson Huber representative sent an email to NHX requesting information for the appraisal. (Id., Ex. 3.) Everson Huber specifically requested "copies of all signed and out for signature leases" and "information pertaining to leases in negotiation." (Id.) As is discussed more fully infra, NHX and Electrolux executed a letter of intent ("November LOI" or "Electrolux LOI") to lease the vacant two-story building just two days before this Everson Huber email. (Swope Aff. ¶ 12.) According to the terms of the November LOI, Electrolux would lease all 84,000 square feet of the two-story building for at least ten years at $9 per square foot and would pay its share of taxes, insurance, and common area maintenance ("TICAM"). (Doc. no. 48., Ex. 55) Electrolux's monthly rental payments to NHX or its assigns would be $84,324.[5] (Id.)

After receiving Everson Huber's email, Timberlake emailed the other Individual Defendants and their Glass Ratner representative. (Garcia Dep., Ex. 2.) He stated: "We received a request for extensive information from the Compass appraiser . . . How would you suggest we respond?" (Id.) While the email chain abruptly ends soon thereafter, it is clear that the appraiser was never informed of the November LOI. (See Huber Dep. at 46-47; Doc. no. 48, Ex. 38.) On December 2, 2010, Everson Huber issued an updated

---

[5] As of November 2010, NHX's monthly rental income from all of its other tenants was only about $45,000. (Brown Dep., Ex. 1 at 7.)

appraisal which concluded that the Property had an $8 million "as is" market value ("December 2010 Appraisal").[6]  (Doc. no. 48, Ex. 38.)

On December 6, 2010, Compass Bank withdrew the foreclosure advertisement and indefinitely postponed any foreclosure sale after NHX agreed to pay $147,354 for the 2010 real estate ad valorem taxes then due and to work out a short sale[7] of the Property in accordance with Compass Bank's interpretation of the FDIC guidelines and Loss Share Agreement.  (Timberlake Aff. ¶ 28; Garcia Dep. at 47.)

On December 20, 2010, Compass Bank sent two settlement offers to NHX via Glass Ratner.  (Doc. no. 48, Ex. 64.)  In the first settlement offer, Compass Bank proposed that NHX pay off the Original Loan for $7.75 million, plus interest due, and $1.1 million paid at closing.  (Id.)  In the second settlement offer, Compass Bank proposed that NHX pay off the Original Loan for $7.9 million plus interest due.  The guarantors would additionally pay $450,000 and sign three-year deficiency notes totaling $750,000.  (Id.)  Under either offer, Compass Bank indicated that the purchaser of the property "may not be related to the borrower or the members of the borrowing entity."  (Id.)  Under Compass Bank's interpretation of the FDIC Guidelines, it was not permitted to let

---

[6] Timberlake would later email Garcia and quibble with the appraiser's assumptions that led to the increase of the "as is" value from $7.75 million to $8 million.  (Doc. no. 80, Ex. 1 at 79.)

[7] Here, a "short sale" indicates a sale of the Property for less than the outstanding loan balance.  (Doc. no. 86, Ex. 1 at 38; Timberlake Aff. ¶ 28.)

the borrower buy back the Property or sell it to a related party; the short sale buyer would have to be unrelated to NHX and the guarantors of the Original Loan. (Garcia Dep. at 20-21, 45-47.)

In early January 2011, Compass Bank informed Timberlake that it would also require a 30-day active marketing period prior to a short sale and settlement of the Original Loan. (Timberlake Aff. ¶ 30; Garcia Dep. at 35, & Ex. 6.) On January 7, 2011, Defendants, via Glass Ratner, sent a letter to Garcia vigorously objecting to the 30-day marketing period. (Garcia Dep., Ex. 6.) Further, Defendants indicated that Compass Bank's revised conditions were creating uncertainty and "caus[ing] the leasing efforts to come to a virtual standstill."[8] (Id.) On January 12, 2011, Garcia responded and indicated that, to proceed with a short sale, Compass Bank would require NHX to submit a marketing plan to her and list the Property with a credible broker at a reasonable price. (Zibilich Dep. at 21-22.)

On behalf of NHX, BMP had previously compiled a "Marketing Package" and contacted seventeen equity prospects in mid-December 2010.[9] (Id., Ex. 5 at 1, 3.) BMP's marketing effort consisted solely of direct contact; the Property was not listed on a multiple listing service for commercial real estate. (Id. at 38.) The Marketing Package sought $8 million as the purchase price and

_____

[8] This representation appears to be false or at least misleading. Electrolux signed a lease on the vacant two-story building just ten days prior to the January 7, 2011 letter claiming that Compass Bank had caused leasing efforts to come to a standstill. (See Doc. no. 48, Ex. 46.)

[9] BMP may have contacted a total of about forty to sixty equity prospects. (Id. at 29, 44.)

indicated that any transaction must be completed by approximately January 31, 2011. (Id., Ex. 5 at 7.) The Marketing Package disclosed that NHX had signed LOIs on the vacant two-story building and the old movie theatre, which together accounted for 58% of the gross leasable area. (Id., Ex. 5 at 8.) It further disclosed that the two-story building would be backfilled by a publicly traded company with $15 billion in annual revenue and projected that the lease-up would bring a stabilized net operating income of $1.9 million. (Id.)

On January 26, 2011, BMP emailed Garcia and attached the Marketing Package and list of prospective purchasers. (Id., Ex. 5 at 1, 3.) At that time, five of the equity prospects were listed as interested. (Id.) On February 1, 2011, BMP sent Garcia a revised Marketing Package and an updated list of twenty-two equity prospects. Again, five were listed as interested. (Id., Ex. 6 at 1, 56.) Another version of the equity prospect list, sent from BMP to Timberlake, listed KHY & Associates, LLC ("KHY") as interested and noted that it had been initially contacted in October 2010. (Doc. no. 48, Ex. 35.)

KHY was 95% owned by Richard Harrell ("Harrell"). (Harrell [May 24, 2012] Dep. at 13.) Harrell also managed KHY. (Id.) Harrell had significant business dealings with several of the Individual Defendants between 1992 and 2009, but primarily with Abernathy. (See Abernathy Dep. at 33-34; Doc. no. 50 at 14-15, 20-21.) These business relationships ranged from minor

11

investments in residential lots to major investments in commercial real estate. (Doc. no. 50 at 14-15, 20-21.) Abernathy provided BMP with Harrell's name as a prospective purchaser.[10] (Abernathy Dep. at 50.)

### 5. *The Second Sale of the Property and Settlement of the Original Loan*

On February 9, 2011, Timberlake and Swope met with Harrell to discuss a deal for the Shopping Center. (Doc. no. 48, Ex. 36.) At that meeting, Harrell apparently offered $7.5 million for the Property, and Timberlake apparently negotiated the price up to $8 million.[11] (Harrell [Jan. 10, 2012] Dep. at 10; Timberlake Aff. ¶ 32.) KHY signed a LOI to purchase the Property for $8 million, all cash at closing.[12] (Zibilich Dep., Ex. 7.) On the same day, Timberlake sent a settlement proposal to Compass Bank, along with KHY's LOI. (Doc. no. 86 at 18; Timberlake Aff. ¶ 33.)

Notably, NHX and Electrolux executed a final lease on the two-story building just five days beforehand. (Jerome Dep., Ex. 1.) NHX or its assigns would receive approximately $970,000 per year on the lease. (See id., Ex. 1 at 14, 25.) Curiously, it appears that Defendants never informed Compass Bank of this valuable development. Nor did Defendants attempt to market the

---

[10] In marketing commercial real estate, it is customary for the owner to provide the broker with names of potential purchasers. (Zibilich Dep. at 46; Swope Dep. at 28.)

[11] According to Defendants' broker, it was known that the sales price had to be at least $8 million for Compass Bank to accept a settlement. (Zibilich. Dep. at 52.)

[12] None of the other equity prospects had made a written offer at that point. (Zibilich Dep. at 45; Garcia Dep. at 54-55.)

Property using the Electrolux Lease, which would have been quite valuable to a third party buyer considering that it would increase occupancy of the Shopping Center from 27% to 79% and substantially increase the net operating income of its owners. (See id.; Garcia Dep. at 38, & Ex. 7 at 4.)

On February 16, 2011, Garcia prepared a memorandum summarizing the history of the Original Loan, valuation of the Property, loan strategy options, and the short sale settlement offer received from NHX. (Garcia Dep., Ex. 7.) In assessing the value of the Property (and in deciding on whether to agree to the short sale), Garcia relied solely on the December 2010 Appraisal that set an $8 million "as is" value. (Id. at 38.) The memo and settlement offer were submitted to Compass Bank's problem asset committee for approval. (Id., Ex. 7.)

The short sale and settlement offer were approved. On April 22, 2011, Compass Bank, NHX, and the guarantors of the Original Loan (Timberlake, Abernathy and Gaultney) executed a settlement agreement with mutual releases. (Garcia Dep., Ex. 10.) In accordance with the settlement agreement, NHX sold the Property to National Hills Exchange Partnership, LLC ("NHEP")[13] for $8 million (the "Short Sale"). (Id.) NHX then paid Compass Bank the $8 million. (Id.) Additionally, the guarantors paid Compass Bank a

---

[13] On March 18, 2011, Becky Kicklighter, who worked for the Individual Defendants, filed articles of organization for NHEP. (Brown Dep. at 34; Kicklighter Dep. at 22.) DeThomas was listed as the organizer and the registered address was the same as the Individual Defendants' primary business address. (Brown Dep. at 34.) Harrell was designated as NHEP's sole member. (Doc. no. 48, Ex. 40.) At some point, Harrell assigned KHY's interest in the February 9, 2011 LOI to NHEP. (Doc. no. 86 at 19.)

deficiency totaling $1.1 million ($350,000 cash and a $750,000 promissory note).  (Id.)  At the time of the settlement, there was a $14.2 million outstanding balance on the Original Loan.  (Id.) NHX did not make a profit on the sale, never distributed any profits, and no longer has any assets.  (Kicklighter Aff. ¶¶ 3-4.)

The settlement agreement stated that NHEP was a third party and unrelated to NHX and the guarantors.  (Garcia Dep., Ex. 10.) Indeed, Garcia considered it to be an arm's length transaction at the time.  (Garcia Dep. at 55.)  However, Garcia testified that she assured herself that NHEP was an unrelated third party solely from information provided by the Individual Defendants.[14]  (Id. at 22.)

Harrell, as the sole member of NHEP, financed the $8 million purchase of the Property with a $4 million six-month loan from Atlantic Capital Bank (the "Short Term Loan") and $4 million in cash from Harrell's company KHY.  (Harrell [May 24, 2012] Dep. at 6-8; Blum Dep. at 17.)  In regards to the Short Term Loan, the promissory note was signed by Harrell on behalf of NHEP. (Abernathy Dep., Ex. 1.)  However, on April 22, 2011, (the same day as the short sale and settlement), each of the Individual Defendants signed a "Put Option" agreement, whereby Atlantic Capital Bank was granted the right to require the Individual

---

[14] After being apprised that the property was resold to the guarantors of the Original Loan and members of NHX about two months after the settlement (as discussed infra), Garcia was not so sure that the Short Sale and settlement would have satisfied the "unrelated" requirement under the FDIC Guidelines. (Id. at 50-51.)   If she had known that such a two-stage transaction was intended, she would have presented the issue to her supervisors at Compass Bank. (Id.)

Defendants to assume the $4 million obligation imposed by the promissory note. (Id.)   While Atlantic Capital Bank did due diligence on Harrell and made him sign a guaranty, it would not have made the Short Term Loan without the Put Option. (Blum Dep. at 31, 42-44.)   Interestingly, Peter Blum ("Blum"), the Senior Vice President at Atlantic Capital Bank who handled the Short Term Loan, knew most of the Individual Defendants quite well and was originally approached about the Short Term Loan by Abernathy, not Harrell. (Blum Dep. at 6, 14, 19.)

Concerning the $4 million in cash provided by Harrell's company KHY, it was revealed to Plaintiffs (after the close of discovery) that Timberlake and Abernathy each loaned $1 million to KHY the day before the Short Sale. (See Doc. no. 57 at 28-40; Doc. no. 36.)   It is unclear where the remaining $2 million came from, but it possibly originated from existing KHY funds. (Harrell [May 24, 2012] Dep. at 7-8.)   In summary, the Individual Defendants had a substantial role in funding at least $6 million of the $8 million purchase price provided by NHEP to NHX at the Short Sale.

### 6. *The Third Sale of the Property*

On April 18, 2011, prior to purchasing the Shopping Center, Harrell decided to hire the Individual Defendants to manage the Shopping Center once the Short Sale was completed. (Doc. no. 48, Ex. 65.)   On April 28, 2011, soon after the Short Sale, Harrell, on behalf of NHEP, entered into a leasing and management contract

with 2701 Partners, LLC ("2701 Partners").   (Id., Ex. 42.)   2701 Partners was formed, owned, and managed by the Individual Defendants. (Timberlake Aff. ¶ 36; Abernathy Dep. at 5.)

On June 17, 2011, Harrell sold his interest in NHEP to 2701 Partners for approximatey $4.5 million, plus assumption of the $4 million Short Term Loan from Atlantic Capital Bank.   (Swope Aff. ¶ 22; Doc. no. 48, Ex. 60.)   Thus, the Individual Defendants, as members of NHX, sold the Shopping Center to NHEP and, just 56 days after that Short Sale, reacquired the Shopping Center as members of 2701 Partners.

Harrell walked away from his 56-day ownership of the Property with a $130,000 profit.   (Harrell [Jan. 10, 2012] Dep. at 18.) Even while Harrell owned the Property, the Individual Defendants were managing and controlling the Property.   (Id. at 20.)   Harrell testified that, at the time he bought the Property, there was never an agreement to reconvey it to the Individual Defendants, but it "was a possibility."   (Id. at 31-32.)   When he sold the Property to 2701 Partners, he did not list it with an agent or talk to any other potential purchasers besides the Individual Defendants.   (Id.)   Harrell knew that Electrolux had signed a binding lease in February and that the Individual Defendants were working to resolve the lease's remaining contingencies, but did not request a status report on the Electrolux Lease before closing the sale.   (Id. at 17-22, 26, 29, 38.)   According to Harrell, he decided to sell the Property to 2701 Partners because he knew he

could recover his expenses and make a short term profit, there had been some cost overruns, the need for capital was greater than he anticipated, and he had some concerns about the Electrolux lease contingencies.  (Id. at 17-20, 29-30, 32-33, 38.)

Blum, however, was asked whether, at the time that he authorized the Short Term Loan to Harrell, it was known that the Individual Defendants would later reacquire the Property.  (Blum Dep. at 41.)  In response, Blum testified that he "was always aware that the intent would be that Abernathy and Timberlake would reacquire the property."[15]  (Id. at 42.)  When Abernathy was asked whether he agreed with Blum's testimony, he stated: "Absolutely."[16] (Abernathy Dep. at 71.)

2701 Partners funded its reacquisition of the Shopping Center from Harrell with a $14.5 million loan from Atlantic Capital Bank. (See Doc. no. 48, Ex. 60.)  Atlantic Capital Bank was willing to make a $14.5 million loan on the Property based on an appraisal issued by CB Richard Ellis on June 11, 2011 ("CBRE Appraisal"). (Doc. no. 48, Ex. 43; Blum Dep. at 24-25.)  The CBRE Appraisal concluded that the Property had an "as is" value of $22.65 million.[17]  (Doc. no. 48, Ex. 43; Blum Dep. at 24-25.)

---

[15] When questioned by Defendants' counsel, Blum equivocated to some extent, stating that he did not know whether Harrell and the Individual Defendants had an agreement that the Property would be resold to the Individual Defendants and had not seen such an agreement.  (Id. at 51.)

[16] Abernathy later equivocated and retracted his testimony to some extent. (See Abernathy Dep. at 125-27, 131.)

[17] The CBRE Appraisal was issued to Atlantic Capital Bank about a week before Harrell sold NHEP's interest in the Shopping Center to 2701 Partners. Harrell stated that he was not aware of the CBRE Appraisal when he sold the Property.  (Harrell [Jan. 10, 2012] Dep. at 26.)

The CBRE Appraisal valued the Property much higher than the Everson Huber appraisals from July and December 2010, which gave "as is" values of $7.75 million and $8 million, respectively. The crucial difference was that the CBRE Appraisal considered the value of the signed Electrolux Lease and assumed its contingencies would be met.[18]   (See Doc. no. 48, Ex. 43.)   As previously discussed, Everson Huber was never informed of Electrolux's November LOI.   Further, during the two and one-half months between the signing of the Electrolux Lease and the Short Sale, the Individual Defendants never informed Compass Bank about the lease, and the Property was not reappraised.

Based on communications with some of the Individual Defendants, Blum believed there was a good chance the Electrolux Lease contingencies would be resolved, and Atlantic Capital Bank was therefore willing to loan $14.5 million based on the CBRE Appraisal.   (Blum Dep. at 25, 47.)   Blum thought the Electrolux Lease contingencies "had been largely satisfied, maybe not 100 percent, but we had enough reasoning to believe that the remaining conditions would be resolved."   (Id. at 32.)   Atlantic Capital Bank also required each of the Individual Defendants to sign joint and several guaranties of the $14.5 million loan.   (Blum Dep. at 25; Doc. no. 48, Ex. 61.)

---

[18] The CBRE Appraisal also considered a proposed lease with the Legend's Club, a banquet facility operator, on a smaller vacant space. (Doc. no. 48, Ex. 43.)

### 7. *The Electrolux Lease*

Although the Electrolux Lease has already been alluded to in the previous sections, a more thorough history of the lease is recounted here.  By June 8, 2010, Electrolux was interested in the vacant, two-story building with 84,000 square feet of leasable space.  On that date, the executive director of the Augusta-Richmond County Development Authority ("Development Authority"), emailed Swope indicating that Electrolux wanted to visit the two-story building again.  (Swope Aff. ¶ 9; Doc. no. 48, Ex. 44.)

Electrolux intended to use the building for a customer call center and began negotiating a lease. (Doc. no. 80, Ex. 1 at 82-83.)  On August 25, 2010, NHX signed a nondisclosure agreement covering information communicated by Electrolux during lease negotiations.[19]  (Id.)  Between September and November 2010, there were various drafts and revisions of a LOI between NHX and Electrolux.[20]  (Id., Ex. 1 at 84-104.)  All the draft LOIs proposed a ten-year lease term (with two five-year options to renew) and rent at about $9-10 per square foot or approximately $80,000 per month.  (Id.)  All the draft LOIs specified three contingencies: (1) approval of financing for tenant improvements by NHX's lender, (2) approval of Electrolux's use by The Fresh Market,[21] and (3)

---

[19] The agreement did, however, permit NHX to disclose Electrolux's confidential information to lenders, employees, agents, consultants, affiliated companies, and attorneys. (Id.)

[20] The draft LOIs all listed NHX "or its assigns" as a party to the nonbinding agreement. (Id., Ex. 1 at 84-104.)

[21] The Fresh Market's lease prohibited call centers in the Shopping Center. (Koch Dep. at 15-17.)

approval of additional financing for the parking lot by the Development Authority. (Id.; Swope Aff. ¶ 11.) On November 20, 2010, NHX and Electrolux signed a nonbinding LOI.[22] (Swope Aff. ¶ 12.) By that date, Electrolux knew the space was suitable and "right for us." (Jerome Dep. at 20.)

On December 29, 2010, Electrolux signed a lease for the two-story building. (Doc. no. 48, Ex. 46.) NHX, however, did not sign the December 2010 lease. (Id.; see also Swope Aff. ¶ 13.) On January 25, 2011, Electrolux revoked its offer to lease the space. (Jerome Dep., Ex. 1 at 87.) Electrolux decided it wanted to be provided a nondisturbance agreement from any secured lender as an additional contingency to the lease. (Id., Ex. 1 at 54.) However, an internal Electrolux email stated: "Their attorney understands that we are not trying to stop this deal, right?" (Id.) The issue was promptly resolved during the week following the revocation. (See id., Ex. 1 at 55-58.)

On February 4, 2011, NHX and Electrolux executed the final, binding lease ("Electrolux Lease"). (Id., Ex. 1 at 8-53.) Electrolux agreed to lease all 84,324 square feet of the building at $9 per square foot for the first five years and $9.40 per square foot for the second five years. (Id., Ex. 1 at 11, 13.) TICAM charges would amount to $2.50 per square foot. (Id., Ex. 1 at 14.) Under these terms, NHX would receive $80,810.50 per

---

[22] The November LOI signed by Electrolux is not in the record (see Jerome Dep. at 67-68), but the Court assumes its terms are substantially similar to the draft LOIs, which all have fairly consistent terms.

month, which equates to $969,726 per year.  (Id.)  The lease would more than double NHX's rental revenues.  (See Brown Dep., Ex. 1 at 7.)  Electrolux was granted the right to renew the lease for two additional five-year terms with rental rates adjusted by changes in the Consumer Price Index.  (Jerome Dep., Ex. 1 at 33.)  NHX was granted "an absolute, unequivocal right to assign or transfer its interest," and Electrolux "agree[d] that this Lease shall remain in full force and unaffected by such transfer or assignment."  (Id., Ex. 1 at 25.)

The Electrolux Lease contained the same contingencies that were included in the November LOI: (1) NHX was required to secure financing for certain tenant improvements, (2) NHX was required to secure written consent from The Fresh Market to waive the provision in its lease prohibiting call centers and agree to certain parking and access arrangements, (3) provision of additional financing from the Development Authority to build more parking spaces, and (4) provision of a nondisturbance agreement from any secured lender.  (Id., Ex. 1 at 10.)  If the contingencies were not met by July 6, 2011, Electrolux had an option to terminate the lease.  (Id., Ex. 1 at 11.)

There is some evidence indicating that, early in the process, it was expected that the contingencies would be met.  For example, in March 2011, Electrolux began spending money on renovation of

the building.[23]    (Jerome Dep. at 25-26, 52-53.)    Regarding The
Fresh Market lease contingencies, Swope and DeThomas – around the
time that the November LOI was signed – told Electrolux they
"didn't think it would be a problem" to resolve the parking and
access issues with The Fresh Market.    (Jerome Dep. at 22-23.)    On
December 16, 2010, Swope and Timberlake met with The Fresh
Market's real estate director, who was "open to the idea" of the
Electrolux tenancy but reluctant in terms of some of the parking
and access impacts.    (Koch Dep. at 9-10.)    In early April 2011,
NHX and The Fresh Market negotiated certain concessions, and The
Fresh Market's real estate committee approved the Electrolux uses
which violated The Fresh Market's original lease.    (Koch Dep. at
13, & Ex. 4.)    On April 22, 2011, NHEP and The Fresh Market signed
an amendment to The Fresh Market Lease.    (Koch Dep., Ex. 1.)    The
Fresh Market consented to Electrolux's use of the adjacent
building as a customer support center, and the parking and access
issues were resolved.    (Id.)    NHEP made certain economic
concessions to The Fresh Market.    (See id.)

Regarding the Development Authority contingency, Electrolux
comfortably believed – by November 2010 – that the Development
Authority would provide the additional funding for the parking
expansion.    (Jerome Dep. at 22.)    As of January 26, 2011, the
Marketing Package stated that the "parking lot will be expanded

---

[23] Electrolux spent about $1.5 million on construction and renovation.
(Jerome Dep. at 54.)    Most of that money, however, was spent between June and
September 2011.    (Id. at 55.)

22

with [a] $1 million contribution from Richmond County." (Zibilich Dep., Ex. 5 at 1, 8.)   As of March 11, 2011, Timberlake indicated that the Development Authority was prepared to spend $1 million to expand and improve the parking lot for Electrolux.   (Koch Dep., Ex. 3 at 2.)   On May 20, 2011, the Development Authority, NHEP, and Electrolux entered a formal agreement which provided for additional financing by the Development Authority for parking lot construction. (Swope Aff. ¶ 19; Doc. no. 48, Ex. 59.)

As to NHX's obligation to finance a portion of the tenant improvements, the funding was obtained[24] and NHEP made the necessary renovations. (Swope Aff. ¶¶ 20-21.)   All contingencies were met and Electrolux moved in as a tenant on September 19, 2011. (Id.)

### 8. Defendants' Communications with Raiford and Brown

On November 16, 2010, Timberlake emailed the other members of NHX (Abernathy, Swope, DeThomas, and Gaultney), Raiford (who held a 15% equity interest in NHX), and Brown (who held a 5% interest in NHX). (Brown Dep., Ex. 1 at 1.)   Timberlake indicated that Compass Bank had acquired the Original Loan from Guaranty Bank and was demanding payment in full.[25]   (Id.)   Timberlake proposed a

---

[24] It's unclear from whom the Defendants obtained the tenant improvement financing and who provided what amounts. (See Swope Aff. ¶¶ 20-21.) Some of the funding was obtained from Atlantic Capital Bank's refinancing of the project. (See Doc. no. 48, Ex. 60.) Harrell may have used some of his own money to finance renovations during his short term ownership of the Property. (Harrell [Jan. 10, 2012] Dep. at 42.) It's also possible that the Individual Defendants provided some financing. (See Timberlake Aff. ¶ 10; Doc. no. 57 at 28-40.)

[25] The Individual Defendants learned this fact over a month earlier on September 29, 2010. (See Garcia Dep., Ex. 9.)

23

meeting at his office on November 23, 2012, to discuss restructuring the debt. (Id.) Neither Raiford nor Brown participated in the proposed meeting. (Timberlake Aff. ¶ 42; Raiford Aff. ¶ 6.) On November 17 and 23, 2010, NHX's latest operating statement was sent to Brown and Raiford, respectively. (Brown Dep., Ex. 1 at 4-11.) None of these November emails revealed that NHX was negotiating a LOI with Electrolux.

On November 29, 2010, Brown followed up and asked Timberlake: "Could you please send me a leasing plan, including prospects and likelyhood (sic) of completing a deal, and a post-development profitability projection? . . . Also, what are my options and what is my 5% carried interest worth . . . and when do we need to make an individual decision?" (Id., Ex. 1 at 12.) Timberlake's response made no mention of the then-signed Electrolux LOI and informed Brown that his 5% interest currently had no value, but that there was a chance that NHX could make a profit if the debt was restructured. (Id., Ex. 1 at 13.)

On December 1, 2010, Timberlake emailed Raiford and Brown a "Conservative Assessment" and "Upside Assessment" of the Shopping Center's potential profitability. (Id., Ex. 1 at 15-16.) The Conservative Assessment contemplated tearing down the two-story building and another building to reduce TICAM expenses. (Id.) No profit would be generated under that scenario. (Id.) The Upside Assessment contemplated refinancing, an additional equity investment of about $4 million, a full lease-up of the vacant

buildings, and a potential profit of about $4 million at final stabilization. (Id.) Timberlake stated that "no estimate can be given as to when final stabilization may be completed." (Id.) Again, there was no mention that Electrolux had recently signed a LOI.

In this general time period, Raiford had a series of telephone conversations with Swope asking for information about the Shopping Center, but was never informed about Electrolux or any other prospective tenants. (Raiford Aff. ¶¶ 7-8.) Raiford and Brown agreed that Brown would be the principal contact with the Individual Defendants. (Id. ¶ 9.)

On January 4, 2011, Timberlake emailed Raiford and Brown. (Brown Dep., Ex. 1 at 17.) He indicated that they were moving closer toward a sale and refinance of the Property. (Id.) He stated that they would be forming a new partnership, and all partners would be required to sign joint and several guaranties. (Id.) He stated that the prospective lenders, GE Capital and State Bank, needed financial statements from all of the partners before they would issue a term sheet. (Id.) Timberlake, however, did not mention that Electrolux had recently signed a ten-year lease that would substantially increase the Property's value.[26]

Raiford responded that he would have his accountant send his financial statement, but he never followed up. (Id., Ex. 1 at 18; Timberlake Aff. ¶ 46.) Brown's response directly requested – for

---

[26] The lease signed by Electrolux on December 29, 2010 was not revoked until January 25, 2011. See supra Section I.A.7.

the second time – a list of prospective tenants. (Brown Dep., Ex. 1 at 20.) Timberlake's reply to Brown stated that, to be part of the new partnership, Brown would have to (1) send a financial statement, (2) be prepared to make an equity investment, and (3) be willing to sign a joint and several guaranty on a $14 million to $16 million loan. (Id., Ex. 1 at 21.) On January 12, 2011, Timberlake sent Brown another reply stating that a lease with Firehouse Subs had fallen through due to unfunded tenant improvements and "we are at a virtual standstill with our leasing efforts."[27] (Id., Ex. 1 at 22.)

Brown responded immediately and again asked for a report on leasing prospects. (Id., Ex. 1 at 23.) In a January 13, 2011 reply, Timberlake provided additional information to Brown. (Id., Ex. 1 at 24.) He stated that a "prospective office tenant . . . has shown interest in the Dillard's building," but did not indicate that Electrolux had signed a lease or provide any information regarding the terms and potential income which that lease would generate.[28] (Id.)

On February 14, 2011, Brown emailed Timberlake and Abernathy for an update on the Shopping Center. (Id., Ex. 1 at 27.) In response, Timberlake did not tell Brown about the recently signed Electrolux Lease. Instead, Timberlake stated: "We assumed that

---

[27] Timberlake was well aware that they had a signed lease from Electrolux in hand at that point. (Timberlake Aff. ¶ 35; Swope Aff. ¶ 13.)

[28] Timberlake stated that NHX could not sign any new leases without lender approval. (Id.) However, nothing on the record indicates that NHX ever obtained Compass Bank's approval when it signed the February 4, 2011 lease with Electrolux. In fact, the opposite is true – the Individual Defendants never informed Compass Bank about the Electrolux Lease.

you chose not to be a part of the new LLC because you failed to submit the requested financial information . . . . The opportunity is no longer available." (Id., Ex. 1 at 28.)

On February 17, 2011, Raiford learned about the Electrolux Lease for the first time when he read about it in the newspaper. (Raiford Aff. ¶ 11.)  On March 15, 2011, Raiford's counsel sent Abernathy a letter expressing surprise about the Electrolux Lease. (Doc. no. 48, Ex. 50.)  The letter requested an appraisal or pro forma indicating how much value was added by the Electrolux Lease, as well as "all material information in order to make an investment decision." (Id.)  Timberlake's response contained only copies of previous emails and provided no new information to Raiford. (Id., Ex. 51.)  On April 18, 2011, Brown informed Abernathy that Raiford and Brown would like to have a meeting about the Property and the partnership request. (Brown Dep., Ex. 1 at 29.)  Timberlake replied that he would contact them with an alternative meeting date. (Id., Ex. 1 at 30.)  On April 26, 2011, Timberlake emailed Raiford and Brown to let them know that the Shopping Center had been sold to NHEP for $8 million, but no other information was provided.[29] (Id., Ex. 1 at 31.)

**B. Procedural History**

On September 13, 2011, Plaintiffs filed this action alleging claims of breach of contract, tortious interference with contract, fraud, and specific performance. (Doc. no. 1.)  The Complaint

---

[29] There was some immaterial email correspondence after this date.  (See id., Ex. 1 at 32-43.)

prayed for actual damages, punitive damages, reasonable attorney's fees and expenses, and an injunction. (Compl. ¶ 32.) Plaintiffs alleged that they had a 15% equity interest in NHX and "Defendants caused NHX to convey all or substantially all of its assets, including the Center, to a new limited liability company in which Defendants or some of them have substantial equity interests or other financial interests, the exact nature of which is unknown to Plaintiffs." (Id. ¶¶ 9, 15.) Further, Plaintiffs alleged that Defendants concealed material information about the Electrolux Lease and Defendants' interest in the new LLC. (Id. ¶¶ 13, 25–26.)

On October 18, 2011, the Magistrate Judge entered a Scheduling Order. (Doc. no. 23.) Motions to amend were due by December 10, 2011; the close of discovery was set for February 28, 2012; and civil motions were due by March 29, 2012. (Id.) On November 9, 2012, the Magistrate Judge entered a Revised Scheduling Order. (Doc. nos. 24, 25.) Motions to amend were due by January 9, 2012; the close of discovery was set for March 29, 2012; and civil motions were due by April 28, 2012. (Doc. no. 25.) On March 2, 2012, this Court entered a second Revised Scheduling Order extending the close of discovery to April 28, 2012, and the civil motions deadline to May 28, 2012. (Doc. no. 36.) The other provisions of the prior Revised Scheduling Order "remain[ed] in full force and effect." (Id.) Thus, the January

9, 2012 deadline for motions to amend – which had already passed – was not revived or otherwise extended.

On the January 9, 2012 deadline, Defendants filed a motion to amend seeking to add a counterclaim[30] (doc. no. 29.), and the Magistrate Judge granted the motion (doc. no. 33).   On May 16, 2012, Plaintiffs filed a motion to amend seeking to add a claim for breach of fiduciary duty.  (Doc. no. 45.)   The motion to amend was filed over four months after the applicable January 9, 2012 deadline and more than two weeks after the close of discovery.   In support of the breach of fiduciary duty claim, Plaintiffs alleged:

> Through discovery in this action, Plaintiffs have learned that Defendants caused a new limited liability company to be created and purportedly owned by one Richard Harrell, who acted as their agent; that Defendants transferred [the Property] to this entity for a grossly inadequate price; and that Defendants then caused the said Harrell to convey to Defendants all the ownership interest in the new limited liability company, in the same proportions as Defendants had held the voting ownership interest of [NHX], but while purportedly eliminating any interest therein of Plaintiffs.   These actions of Defendants were taken pursuant to a scheme and plan to "squeeze out" Plaintiffs from [NHX] . . . .

(Doc. no. 47.)   The motion to amend was opposed by Defendants, and both parties thoroughly briefed the issue.  (See Doc. nos. 46, 50, 53, 57, 59, 95.)

On August 15, 2012, the Magistrate Judge entered an Order denying Plaintiffs' motion to amend.  (Doc. no. 102.)   On August

---

[30] Defendants oppose Plaintiffs' specific performance claim (seeking an injunction requiring Defendants to convey a 15% interest in NHEP to Plaintiffs), but Defendants' counterclaim seeks to impose certain conditions upon Plaintiffs' interest in NHEP in the event that Plaintiffs were to prevail on their specific performance claim.  (Doc. no. 29 at 4.)

30, 2012, Plaintiffs filed objections to the Magistrate Judge's Order. (Doc. no. 105.)  The parties have filed numerous responses and replies. (See Doc. nos. 108, 112, 113, 114, 115.)

On May 29, 2012, Defendants filed a motion for summary judgment, along with a supporting brief, statement of material facts, and exhibits. (Doc. no. 48.)  Both parties have thoroughly briefed the summary judgment motion. (See Doc. nos. 80, 94, 99, 100, 103, 107.)  On July 5, 2012, Plaintiffs filed a motion to strike Defendants' motion for summary judgment (doc. no. 61), and Defendants responded (doc. no. 92).  Plaintiffs also requested oral argument on the motion for summary judgment (doc. no. 79), and Defendants concurred in that request (doc. no. 96).

## II. PLAINTIFFS' OBJECTIONS TO THE MAGISTRATE JUDGE'S ORDER

### A. Legal Standard

Plaintiffs object to the Magistrate Judge's August 15, 2012 Order denying Plaintiffs' motion to amend.[31]  (Doc. no. 102.)  A

---

[31] Plaintiffs argue that the applicable standard of review is de novo, as opposed to clear error.  (See Doc. no. 105 at 5-7.)  Federal Rule of Civil Procedure 72 indicates that matters dispositive of a claim or defense are reviewed de novo, and nondispositive matters are reviewed for clear error.  See Fed. R. Civ. P. 72(a)-(b).  The Court need not definitely resolve this issue because the Court would accept the Magistrate Judge's recommended disposition of the motion to amend even if the matter was subject to de novo review.  The Court, however, notes that the Eleventh Circuit has stated that "[a]n order disposing of a motion to amend is a non-dispositive pretrial ruling."  Palmore v. Hicks, 383 Fed. Appx. 897, 899-900 (11th Cir. 2010) (citing cases from the First, Third, Seventh, and Eighth Circuits).  But see Marco Island Cable, Inc. v. Comcast Cablevision of the S., Inc., No. 2:04-cv-26, 2006 WL 1733860, at *1 (M.D. Fla. June 21, 2006) (noting that "it is at least arguable that a decision to deny a motion to amend a complaint is a dispositive ruling" subject to de novo review; Covington v. Kid, No. 94-cv-4234, 1999 WL 9835, at *2 (S.D.N.Y. Jan. 7, 1999) (holding that a magistrate's denial of a motion to amend seeking to add claims is subject to reconsideration de novo because the matter was dispositive of the proposed new claims).  A district court's denial of a motion

30

party may amend its pleadings with the court's leave, and the court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). However, when a motion to amend is filed after a scheduling order's deadline, the amending party must first demonstrate "good cause" under Rule 16(b) before the court considers whether amendment is proper under Rule 15(a). Only after a finding of good cause can a court apply Rule 15's more generous "freely given" standard. See Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1419 (11th Cir. 1998); Smith v. Sch. Bd. of Orange Cnty., 487 F.3d 1361, 1366 (11th Cir. 2007); Oravec, 527 F.3d at 1231; Fed. R. Civ. P. 16(b)(4) (providing that a court's scheduling orders "may be modified only for good cause").

"This good cause standard precludes modification unless the schedule cannot 'be met despite the diligence of the party seeking the extension.'" Sosa, 133 F.3d at 1418 (quoting Fed. R. Civ. P. 16 advisory committee's note); see also Oravec, 527 F.3d at 1232 (holding that the amending party "must show the requisite level of diligence in pursuing his claims"). "The lack of diligence that precludes a finding of good cause is not limited to a plaintiff who has full knowledge of the information with which it seeks to amend its complaint before the deadline passes." S. Grouts & Mortars, Inc. v. 3M Co., 575 F.3d 1235, 1241 n.3 (11th Cir. 2009). Rather, "[t]hat lack of diligence can include a plaintiff's

---

to amend is reviewed for abuse of discretion. Oravec v. Sunny Isles Luxury Ventures, L.C., 527 F.3d 1218, 1231 (11th Cir. 2008).

failure to seek the information it needs to determine whether an amendment is in order." Id. (citing Oravec, 527 F.3d at 1232).

**B. Application**

It is undisputed that Plaintiffs' motion to amend was filed over four months after the January 9, 2012 deadline set by the Magistrate Judge's Revised Scheduling Order. Therefore, Plaintiffs must show good cause and the requisite diligence in seeking the post-expiration extension of the deadline.

Plaintiffs' primary argument is that Defendants' discovery misconduct was the true cause of Plaintiffs' failure to seek leave to amend earlier. Specifically, on October 20, 2011, Plaintiffs served an interrogatory requesting a description of "all business or other relationships that any Defendant has had at any time with Richard Harrell." (Doc. no. 50 at 14.) In December 2011, Defendants responded:

> The Defendants sold the [Shopping Center] to [NHEP].
> Mr. Harrell was the sole member of [NHEP] at the time.
> During [NHEP]'s ownership of the [Shopping Center], Mr.
> Harrell contracted with [2701 Partners] to manage the
> leasing aspects. Subsequently, [2701 Partners] purchased
> Mr. Harrell's membership interests in [NHEP]. Messrs.
> Abernathy, DeThomas, Gaultney, Swope, and Timberlake are
> the members of [2701 Partners]. Mr. Harrell purchased a
> residential lot from Mr. Swope in 2011.

(Id. at 14-15.) As Plaintiffs rightly argue, these disclosures were not sufficiently complete.

At Blum's January 10, 2012 deposition, Plaintiffs learned about the Put Option which allowed Atlantic Capital Bank to substitute the Individual Defendants as obligors on the $4 million

promissory note funding Harrell's acquisition of the Property at the Short Sale. (Blum Dep. at 30-31.) Plaintiffs also learned that Atlantic Capital Bank provided a $14.5 million loan to fund the Individual Defendants' reacquisition of the Property and that Blum "was always aware that the intent would be that Abernathy and Timberlake would reacquire the property." (Id. at 24-25, 41-42.) On the same day, Plaintiffs learned at Harrell's deposition that Harrell never listed the Property with an agent or talked with any potential buyers besides the Individual Defendants. (Harrell [Jan. 10, 2012] Dep. at 31-32.)

On April 9, 2012, Abernathy initially agreed with Blum's statement that it was known that the Individual Defendants intended to reacquire the Property. (Abernathy Dep. at 71.) Further, Plaintiffs learned that Abernathy had been borrowing money from Harrell in connection with real estate transactions since 1992. (Id. at 33-34.) On April 24, 2012, Defendants supplemented their previous interrogatory response and disclosed that (1) in 1992, Abernathy obtained a line of credit from a bank and Harrell was the loan officer; (2) in 1996, Abernathy and Timberlake borrowed funds from a group of investors (one of which was Harrell) to buy part of the Augusta Exchange Shopping Center; (3) in 2004, Abernathy and Harrell were among passive investors in a condominium project in South Carolina; (4) in 2005, Abernathy was a member of a firm that borrowed money from Harrell's company KHY to purchase commercial real estate in Florida; and (5) in

2009, Abernathy borrowed funds from KHY to purchase a residential lot. (Doc. no. 50 at 20-21.) Finally, on May 24, 2012, it was revealed that Abernathy and Timberlake each provided a $1 million loan to Harrell's company KHY to facilitate Harrell's purchase of the Property. (Harrell [May 24, 2012] Dep. at 8-9.)

The Court acknowledges and endorses the proposition that discovery misconduct by an opposing party may constitute "good cause" for modification under Rule 16(b) *when an amending party has otherwise been diligent.* See Wasdin v. Cheetah Transp., LLC, No. 5:05-cv-340, 2006 WL 3534969, at *2 (M.D. Ga. Dec. 7, 2006). The Court does not condone Defendants' apparent failure to provide complete discovery responses.[32] However, the problem with Plaintiffs' position here is that – notwithstanding Defendants' less than candid interrogatory response – Plaintiffs did not exercise the requisite due diligence by amending the Complaint once they had enough information to support a breach of fiduciary duty claim. See Sosa, 133 F.3d at 1418 ("If [a] party was not diligent, the [good cause] inquiry should end.") (quoting Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 609 (9th Cir. 1992).

Plaintiffs might have possessed sufficient information to file a breach of fiduciary claim once Defendants filed their initial interrogatory response in December 2011. By then, Plaintiffs knew that (1) Harrell was not a complete stranger to

---

[32] In particular, Defendants' failure to disclose that Abernathy and Timberlake loaned $2 million to KHY on the day before the Short Sale appears to be an egregious error in judgment. Timberlake's subsequent explanation that he "just forgot" and "made a mistake" when completing the interrogatory responses is unacceptable. (See Timberlake Dep. at 27-31.)

the Individual Defendants since he had some connection to Swope, (2) Defendants sold the Property to Harrell who was then the sole member of NHEP, (3) 2701 Partners managed the Property for Harrell while he owned it, and (4) 2701 Partners later reacquired the Property by purchasing NHEP from Harrell.   These facts are at the core of Plaintiffs' "squeeze out" claim.   Moreover, Plaintiffs knew very early – as of May 17, 2011 (before the Complaint was filed) – that Abernathy and Timberlake were involved in the formation of NHEP.[33]

However, assuming this was not enough information to file a breach of fiduciary duty claim, Plaintiffs certainly had enough information by January 10, 2012.   At that point, they knew about (1) the Put Option, (2) the $14.5 million loan from Atlantic Capital Bank, (3) the CBRE Appraisal which was the basis for the reacquisition loan, (4) Blum's testimony that he believed it was always intended for the Individual Defendants to repurchase the Property, (5) Harrell's testimony that he did not market the Property to anyone but the Individual Defendants, and (6) that the Individual Defendants played a role in forming NHEP.   Had Plaintiffs exercised the requisite degree of diligence, they would have filed a breach of fiduciary duty claim soon thereafter. However, Plaintiffs did not file the motion to amend until May 16, 2012 – over four months later.

---

[33] On that date, Brown sent Raiford and Raiford's counsel an email that he was "suspicious that the former partners of [NHX] were involved in the purchase of the [Property]" because he "obtained a copy of the organizational documents . . . showing the address of the purchaser being the same as the Abernathy-Timberlake Group." (Brown Aff. ¶ 10; see also Raiford Aff. ¶ 12.)

The Magistrate Judge correctly pointed out that none of the information revealed in April 2012 justifies the timing of Plaintiffs' motion to amend. To the extent that Abernathy confirmed Blum's testimony (that the Individual Defendants always intended to reacquire the Property), this information was cumulative of Blum's January 10, 2012 testimony. The extent of Harrell's past dealings with the Individual Defendants was not critical to the "squeeze out" claim and was not made part of the factual allegations once the proposed breach of fiduciary duty claim was eventually filed. (See Doc. no. 47.) Even assuming this information was important, Plaintiffs still waited several weeks to file the motion to amend. As to Harrell's testimony on May 24, 2012, regarding Abernathy and Timberlake's loans to KHY, this information did not affect Plaintiffs' decision to add a breach of fiduciary duty claim because Plaintiffs had already filed their motion to amend at that point.

Furthermore, as the Magistrate Judge astutely observed, Plaintiffs cannot claim that they failed to realize that they needed to act with haste during discovery to procure information regarding the Defendants' role in the sale and repurchase of the Property; Plaintiffs acknowledged in their Complaint that they lacked knowledge regarding the details of these transactions. (See Compl. ¶ 15.) Scheduling Orders assure that "[l]itigants are forced to establish discovery priorities and thus to do the most important work first." Fed. R. Civ. P. 16(b), advisory

committee's note (citation omitted); see also S. Grouts & Mortars, 575 F.3d at 1241 n.3 ("[L]ack of diligence can include a plaintiff's failure to seek the information it needs to determine whether an amendment is in order."). Thus, while Plaintiffs maintain that they were simply being collegial in scheduling the above-referenced depositions (which occurred after the expiration of the motion to amend deadline), diligence dictated that these depositions should have occurred earlier in the discovery process. Alternatively, Plaintiffs could have sought to extend the amendment deadline given that they knew critical witnesses had not yet been deposed.

In conclusion, the absence of the requisite diligence is fatal to Plaintiffs' motion to amend. Accordingly, Plaintiffs' objections to the Magistrate Judge's Order (doc. no. 105) are **OVERRULED**.

### III. MOTION TO STRIKE

Plaintiffs seek to strike Defendants' motion for summary judgment on the basis that Defendants' statement of material and undisputed facts does not comply with Local Rule 56.1. (Doc. no. 61.) Local Rule 56.1 provides that a motion for summary judgment shall be accompanied by "a separate, short, and concise statement of the material facts as to which it is contended there exists no genuine dispute to be tried as well as any conclusions of law thereof." S.D. Ga. L.R. 56.1. Plaintiffs argue that Defendants'

statement (1) is not short and concise; (2) attempts to convert disputed facts into undisputed facts by prefacing the factual statement with qualifiers indicating that a certain witness testified to the fact, but where it was known that another witness contradicted that same fact; and (3) improperly blends legal argument into the factual statement.

As to Plaintiffs' first argument, the factual record in this case is extensive. Seventeen depositions, five affidavits, plentiful correspondence, and numerous transactional documents have been filed. The Court cannot fault Defendants for drafting an appropriately lengthy statement of facts. As to the remaining arguments, Plaintiffs have provided no authority showing that striking Defendants' motion for summary judgment is an appropriate remedy for the noncompliance alleged. See Purdee v. Pilot Travel Ctrs., LLC, No. 4:07-cv-028, 2009 WL 423976, at *3 (S.D. Ga. Feb. 19, 2009) ("Defendant moves this Court to strike Plaintiff's entire Statement of Material Facts because it is 'not a concise statement of material facts' as required by Local Rule 56.1. Even assuming, arguendo, that such a violation has occurred, Defendant has provided no law showing that the appropriate remedy for a violation of Local Rule 56.1 is a Motion to Strike – an extreme remedy.") (emphasis added). Moreover, the Court will "disregard any statements of material fact or responses thereto that do not comply with the requirements of LR 56.1." Bagwell v. Peachtree

Doors & Windows, Inc., No. 2:08-cv-191, 2011 WL 1497831, at *5 (N.D. Ga. Feb. 8, 2011) (analyzing similar motion to strike).

The Court, of course, does not seek to minimize the importance of Local Rule 56.1.  The purpose of Local Rule 56.1 is to assist the Court in determining which facts are genuinely undisputed.  See Madison Maidens, Inc. v. Am. Mfrs. Mut. Ins. Co., No. 5-cv-4584, 2006 WL 1650689, at *2 (S.D.N.Y. June 15, 2006) (discussing analogous rule).  "The Rule is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary."  Reno v. City of Chicago, No. 10-cv-6114, 2012 WL 2368409, at *1 (N.D. Ill. June 21, 2012) (discussing analogous rule).

The Court has thoroughly reviewed Defendants' statement of facts, Plaintiffs' response thereto, the examples of alleged noncompliance cited in Plaintiffs' motion to strike, and the factual record.  Having reviewed these materials, the Court finds nothing which justifies the extreme remedy of striking Defendants' motion for summary judgment.  For these reasons, Plaintiffs' motion to strike (doc. no. 61) is **DENIED**.

## IV. MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment against all of Plaintiffs' claims.  (Doc. no. 48.)  The Court first reviews the

summary judgment standard and then evaluates each of Plaintiffs' claims - breach of contract, fraud, specific performance, and tortious interference with contract - in light of that standard.

**A. Standard**

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Facts are "material" if they could affect the outcome of the suit under the governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor." U.S. v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case.  See Clark v. Coats & Clark, Inc., 929 F.2d

604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).   Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.   Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam).   A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment."   Id.   When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden.   If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated."   Fitzpatrick, 2 F.3d at 1116.   If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency."   Id. at 1117.   The non-

movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk of the Court gave Plaintiffs notice of the motion for summary judgment and informed them of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. no. 49.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motion is now ripe for consideration.

## B. Breach of Contract

"The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." Duke Galish, LLC v. Manton, 308 Ga. App. 316, 320 (2011). Here, Defendants contest only the first two elements, which the Court discusses in turn.

### 1. Breach

#### a. Basis for Breach

Section 4 of the Second Amended Agreement granted Plaintiffs a 15% equity interest in NHX. NHX no longer has any assets and never generated a profit. Plaintiffs argue that NHX did not

42

generate any profits because Defendants sold the Property to a "straw man" (Harrell) at a price below market value in order to reacquire the Property at an artificially low price while effectively eliminating Plaintiffs' interest and securing a release from the guaranties held by Compass Bank.  Plaintiffs argue that these actions constitute a breach of the duty of good faith and fair dealing which is implied in all contracts.  (See Doc. no. 80 at 12-13.)  Defendants counter that the duty of good faith is not an independent contract term that can be breached. (See Doc. no. 94 at 6.)

Every contract implies a covenant of good faith and fair dealing in the contract's performance.  Secured Realty & Invs., Inc. v. Bank of N. Ga., 314 Ga. App. 628, 630 (2012) (citation omitted).  This implied covenant "modifies the meaning of all explicit terms in a contract, preventing a breach of those explicit terms de facto when performance is maintained de jure." Alan's of Atlanta, Inc. v. Minolta Corp., 903 F.2d 1414, 1429 (11th Cir. 1990) (applying Georgia law).  In other words, "'[g]ood faith' is a shorthand way of saying substantial compliance with the spirit, and not merely the letter, of a contract."  In re Thomaston Mills, Inc., 301 B.R. 918, 924 (Bankr. M.D. Ga. 2003) (quoting Fisher v. Toombs Cnty. Nursing Home, 223 Ga. App. 842 (1996)).

"The implied covenant modifies and becomes a part of the provisions of the contract, but the covenant cannot be breached

apart from the contract provisions it modifies and therefore cannot provide an independent basis for liability." Secured Realty & Invs., 314 Ga. App. at 630; accord Myung Sung Presbyterian Church, Inc. v. N. Am. Ass'n of Slavic Churches & Ministries, Inc., 291 Ga. App. 808, 810 (2008). There is "no independent cause of action for breach of the covenant of good faith and fair dealing under Georgia law." Owens v. Pineland Mental Health, Mental Retardation & Substance Abuse Servs., No. 2:11-cv-196, 2012 WL 2887007, at *4 (S.D. Ga. July 13, 2012).

However, Plaintiffs have not brought an independent cause of action premised solely on the duty of good faith and fair dealing. Plaintiffs assert their contract claim in connection with Section 4 of the Second Amended Agreement, which granted Plaintiffs a 15% equity interest in NHX. Moreover, Defendants overlook two important and related roles of the covenant of good faith and fair dealing.

First, the covenant can – in certain cases – serve as a gap filler to a contract. "'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." Martin v. Hamilton State Bank, 314 Ga. App. 334, 335 (2012). Thus, "[w]hen the contract is silent, principles of good faith . . . fill the gap," as long as they "do not block use of terms that actually appear in the contract." Id. at 335-36.

An implied term in an agreement exists where it is reasonable and necessary to effect the full purpose of the contract and is so clearly within the contemplation of the parties that they deemed it unnecessary to state. [T]he introduction of an implied term into the contract of the parties can only be justified when the implied term is not inconsistent with some express term of the contract and where there arises from the language of the contract itself, and the circumstances under which it was entered into, an inference that it is absolutely necessary to introduce the term to effectuate the intention of the parties.  Consequently, though courts are generally reluctant to make contracts for the parties, they will imply promises or duties when justice, good faith, or fairness so demand.

Myung Sung, 291 Ga. App. at 811 (quotation and citation omitted).

Whether or not a contract "should be construed to contain an implied term is generally a question of law for the trial court."

Id.

Here, Section 4 of the Second Amended Agreement granted Plaintiffs a 15% equity interest in NHX.  The general intent of the parties and the contemplated purpose of this provision was for Defendants to redevelop and sell the Shopping Center and then distribute 15% of the profits to Plaintiffs.  The contract is completely silent as to how Defendants would operate NHX, redevelop the Shopping Center, and sell the Shopping Center. Under these circumstances, Defendants were bound to exercise good faith and fair dealing in the redevelopment and sale of the Shopping Center and could not take an "opportunistic advantage" over Plaintiffs by selling the Shopping Center at an artificially low price for their own pecuniary gain.  Martin, 314 Ga. App. at 335.  This proposition seems "so clearly within the contemplation

of the parties that they deemed it unnecessary to state" it expressly. Myung Sung, 291 Ga. App. at 811. Finally, Defendants have pointed to no express contractual term that is inconsistent with or otherwise blocks this interpretation of the agreement. Id.; Martin, 314 Ga. App. at 335-36.

Second, where the manner of performance is left more or less to the discretion of one of the parties to the contract, that party is bound to exercise good faith and fair dealing. Hunting Aircraft, Inc. v. Peachtree City Airport Auth., 281 Ga. App. 450, 452 (2006); Rogers v. Farmers & Merchants Bank, 247 Ga. App. 631, 632 (2001). "Where an agreement gives a party discretionary decision-making authority, . . . the sole question for a court in reviewing whether the agreement has been breached is whether the decision was made in good faith and involved the exercise of honest judgment."[34]  Planning Techs., Inc. v. Korman, 290 Ga. App. 715, 718 (2008). In this case, both parties agree that while Plaintiffs were granted a 15% equity interest in NHX, Plaintiffs were not granted voting or management rights in NHX. In regards to the management of NHX, the Original Agreement and Second Amended Agreement left the manner of performance to Defendants'

---

[34] There is a "rare exception" to the rule imposing a duty of good faith. Hunting Aircraft, 281 Ga. App. at 451, 453. "If an agreement *by its express terms* grants a party *absolute or uncontrolled discretion* in making a decision, then no duty of good faith is implied as to that decision." Id. at 453 (emphasis added); accord Korman, 290 Ga. App. at 718. "The principle is that the duty of good faith is implied in all contracts, which is the overarching presumption. The exception to this general rule occurs only if the contract expressly (not impliedly) provides otherwise." Hunting Aircraft, 281 Ga. App. at 453. Here, Defendants have not pointed to any contractual language expressly waiving the duty of good faith, and the Court has not located any such language in the Original Agreement or Second Amended Agreement.

46

discretion.   Therefore, Defendants were bound to exercise good faith and fair dealing while redeveloping and selling the Shopping Center, NHX's only asset.

Having concluded that the implied covenant of good faith and fair dealing applies to Defendants' management of NHX and sale of the Shopping Center, the Court briefly examines the general parameters and meaning of the covenant.   "The concept of good faith encompasses basic notions of 'fairness and commercial reasonableness.'"   Capital Health Mgmt. Group, Inc. v. Hartley, 301 Ga. App. 812, 817 (2009) (quoting Hunting Aircraft, 281 Ga. App. at 452).   "[A] decision was not made in good faith if it was made for arbitrary or capricious reasons, was based on an improper pecuniary motive, or was predicated on dishonesty or illegality."   Id. (quoting Korman, 290 Ga. App. at 720); accord ULQ, LLC v. Meder, 293 Ga. App. 176, 180 (2008).   "What constitutes good faith is a question for the finder of fact."   Hunting Aircraft, 281 Ga. App. at 452; see also Rogers, 247 Ga. App. at 632 ("[T]he question of good faith is for the jury.").

### b. Evidence of Breach

There is substantial evidence that (1) Defendants' decision to sell the Shopping Center to Harrell for $8 million was based on an improper pecuniary motive and (2) Defendants were dishonest in achieving that improper objective.   Specifically, there is substantial evidence that Defendants utilized Harrell as a straw man and sold the Property at an artificially low price to

facilitate their own reacquisition of the Property while effectively eliminating Plaintiffs' interest in NHX and obtaining a release of the debt and guaranties held by Compass Bank. The Court does not intend to provide an exhaustive list of evidence available to Plaintiffs, but highlights some of the key evidence in support of their claim.

### i. Evidence that Harrell Was a Straw Man

There is substantial evidence that Harrell was acting as a "straw man."[35]   First and foremost, Harrell only held the Property for 56 days before selling it back to the Individual Defendants (through 2701 Partners' purchase of NHEP) and walking away with a $130,000 profit.   And even while Harrell owned the Property, he hired 2701 Partners to manage the Property's leases.   Further, Harrell did not list the Property with an agent, talk to any other potential purchasers, or request a status report on the signed Electrolux Lease before selling the Property back to the Individual Defendants.

Second, the circumstances surrounding Harrell's purchase of the Property at the Short Sale are highly suspicious.   Harrell had significant business dealings with several of the Individual Defendants between 1992 and 2009, and Abernathy provided Harrell's name to BMP, the broker.   NHEP, the LLC used by Harrell to buy the Property, was organized by the Individual Defendants.   More

---

[35] In this context, a "straw man" is a "third party used in some transactions as a temporary transferee to allow the principal parties to accomplish something that is otherwise impermissible."   BLACK'S LAW DICTIONARY 1461 (8th ed. 2004).

importantly, Harrell financed the $8 million purchase price with (1) the $4 million Short Term Loan from Atlantic Capital Bank, which had a Put Option enabling the bank to substitute the Individual Defendants as obligors on the promissory note; and (2) $2 million in loans made to Harrell's company KHY by Abernathy and Timberlake on the day before the Short Sale. Thus, the Individual Defendants were directly or indirectly responsible for furnishing 75% of the purchase price at the Short Sale. Further, Atlantic Capital Bank was originally approached about the Short Term Loan by Abernathy, not Harrell.

Finally, Blum testified that, at the time he authorized the Short Term Loan to Harrell, he was aware that the Individual Defendants intended to reacquire the Property. Abernathy himself stated, at least initially, that he agreed with Blum's testimony. In summary, there is sufficient evidence from which a jury could reasonably conclude that Defendants used Harrell as a straw man and intended to reacquire the Property.

*ii. Evidence that Defendants Intended to Set an Artificially Low Price*

Having reached that conclusion, a jury could also reasonably infer that Defendants intended to set an artificially low sales price at the Short Sale. If Defendants stood on both sides of the transaction, they would have a pecuniary motive to sell (and then repurchase) at a price below market value. As an added incentive,

Defendants would eliminate any liability to Compass Bank[36] and effectively eliminate Plaintiffs' ownership interests.

Significant evidence supports the inference that Defendants were attempting to set an artificially low price at the Short Sale. On November 20, 2010, NHX and Electrolux signed a LOI that provided for monthly rental payments of approximately $84,000; at the time, NHX's total monthly rental income was about $45,000. Two days later, Compass Bank's appraiser (Everson Huber) sent Defendants an email which specifically requested information about leases in negotiation. Timberlake asked his cohorts, "How would you suggest we respond?", but there is no further discussion of this issue in the email chain. The appraiser's testimony and the December 2010 Appraisal itself make clear that Defendants never informed the appraiser of the LOI signed by Electrolux. (See Huber Dep. at 46-47; Doc. no. 48, Ex. 38.)

On February 4, 2011, NHX and Electrolux executed the final lease. The terms were valuable; the Electrolux Lease would generate almost $1 million per year in annual revenue for ten years with two five-year options. Further, NHX was granted an "absolute, unequivocal right to assign" its interest, which would make the Electrolux Lease equally valuable to an unrelated third party buyer of the Property. However, once the Electrolux Lease was signed, Defendants did not inform Compass Bank of this

---

[36] Defendants argue that they had an incentive to maximize the Short Sale price in order to minimize their deficiency and guaranty liability with Compass Bank. However, Plaintiffs can rebut this fact because Defendants knew - as of December 20, 2010 - that Compass Bank would be willing to settle for about $8 million plus a $1.2 million deficiency. (See Doc. no. 48, Ex. 64.)

development which had the potential to substantially raise the sales price.[37]   Instead, Defendants agreed to sell the Property to Harrell for $8 million and sent a settlement proposal to Compass Bank – all five days after execution of the Electrolux Lease.

A reasonable jury could conclude that – had Defendants been acting in good faith and fair dealing to maximize NHX's potential return at the forced sale – they would have told the Appraiser about the November LOI and told Compass Bank about the signed Electrolux Lease.   A fair-minded jury might also conclude that, if acting in good faith to generate the highest price the market could bear, Defendants would have asked Compass Bank for an extension of the marketing period and reappraisal of the Property once they had the Electrolux Lease in hand.

Two other pieces of evidence support the inference that Defendants sought to chill the sales price.   First, Defendants sent a letter to Garcia objecting to the 30-day marketing period imposed by Compass Bank in January 2011.   Second, when Timberlake learned that Everson Huber had increased the "as is" value from $7.75 million to $8 million in the December 2010 Appraisal, Timberlake sent an email to Garcia quibbling with the assumptions that led to the increased value.

---

[37] The CBRE Appraisal, which considered the potential value of the Electrolux Lease, concluded that the Property's "as is" value was $22.65 million.

### iii. Evidence of Dishonesty

In addition to the evidence of Defendants' improper pecuniary motives, there is evidence that Defendants' actions were predicated on dishonesty. As just discussed, Defendants withheld material information about Electrolux from Compass Bank and Everson Huber. Additionally, Defendants did not disclose to Compass Bank their past dealings with Harrell or that they were helping him finance the purchase. Furthermore, between November 2010 and March 2011, Defendants withheld material information about the Electrolux Lease from Raiford and Brown. As is recounted at length in Section I.A.8, Raiford - and Brown (acting on behalf of Raiford) - made numerous requests for information about leasing prospects, and Defendants did not honestly respond. Defendants' management of NHX and sale of the Property was not undertaken in good faith if it was made "based on an improper pecuniary motive, or was predicated on dishonesty." Capital Health Mgmt. Group, 301 Ga. App. at 817.

### iv. Evidence of Good Faith

While there is substantial evidence that Harrell was a straw man and Defendants were chilling the sales price, there is also evidence to the contrary. Importantly, the Marketing Package - created by BMP and used to directly market the Property - disclosed that NHX had a LOI on the two-story building executed by a publicly traded company with $15 billion in annual revenue. The Marketing Package also disclosed that the lease-up could raise net

operating income to $1.9 million. Defendants sent the Marketing Package to Compass Bank, and Garcia testified that she was satisfied that Defendants were making a good faith effort to market the Property. (Garcia Dep. at 54.) Also, according to Timberlake and Harrell, Timberlake rejected Harrell's initial $7.5 million purchase offer and negotiated the price up to $8 million. Harrell also testified that there was never any agreement to reconvey the Property to Defendants. He further testified that he decided to sell because the need for capital was greater than he anticipated, he had some concerns about the Electrolux contingencies, and knew he could make a short term profit. Finally, Defendants can argue that, based upon its contingencies, the Electrolux Lease was not as valuable as Plaintiffs contend.

### v. Conclusion

If fair-minded men could draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment. Cox v. Adm'r U.S. Steel & Carnegie, 17 F.3d 1386, 1396 (11th Cir. 1994). Ultimately, what constitutes good faith and fair dealing is a question for the jury. Hunting Aircraft, 281 Ga. App. at 452; Rogers, 247 Ga. App. at 632. In this case, there is certainly sufficient evidence for a jury to reasonably conclude that Defendants breached the covenant of good faith and fair dealing that was implied in the Original Agreement and Second Amended Agreement.

### 2. Damages

#### a. Actual Damages

"Damages are given as compensation for the injury sustained as a result of the breach of a contract." O.C.G.A. § 13-6-1. "Damages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from such breach and such as the parties contemplated, when the contract was made, as the probable result of its breach."[38] O.C.G.A. § 13-6-2. The proper "measure of damages is a question of law," but the "amount of damages is a question of fact." Quigley v. Jones, 174 Ga. App. 787, 788 (1995) (citing O.C.G.A. §§ 13-6-2; 13-6-4), aff'd, 255 Ga. 33 (1985).

Here, the injury sustained is that Plaintiffs had a 15% equity interest in NHX and received no profits from NHX's sale of its only asset, the Shopping Center. At the time Plaintiffs entered into the Second Amended Agreement, the parties contemplated that Plaintiffs would receive 15% of NHX's profits. Thus the natural consequence of the alleged breach – the loss of NHX's profits – was foreseeable at the time of the contract.

Defendants, however, argue that NHX's loss was caused by Compass Bank and that they could not have sold the Shopping Center for a profit. Defendants are correct that refinancing, extending

---

[38] The Court notes that "[t]he proximate cause concept of the law of torts and in a breach of contract seem to differ only in that the probable and natural consequences of the breach must have been foreseeable at the time the contract was entered into." Nat'l Hills Shopping Ctr., Inc. v. Ins. Co. of N. Am., 308 F. Supp. 248, 251 (S.D. Ga. 1970) (citing 5 Williston on Contracts § 1344); see also Carolina Indus. Products, Inc. v. Learjet, Inc., 189 F. Supp. 2d 1147, 1183-84 (D. Kan. 2001) (applying Georgia law).

the loan, or other measures that would have allowed NHX to retain control of the Property were out of the question under Compass Bank's interpretation of the FDIC Guidelines.   Compass Bank essentially presented Defendants with two options: foreclosure or a forced sale to an unrelated third party.   Defendants pursued the second option.[39]   Thus, the question can be refined as follows: If Defendants had in good faith sought to sell the Property at market value to an unrelated third party, would NHX have generated a profit?

At the time of the Short Sale, NHX owed Compass Bank $14.2 million.   Thus, the purchase price would have needed to exceed $14.2 million to generate a profit.[40]   Accordingly, the measure of Plaintiffs' damages is 15% of the difference between the $14.2 million profit threshold and the probable sales price assuming Defendants had acted in good faith.

There is sufficient evidence on the record for a jury to reasonably infer that the Property would have sold for over $14.2 million if the Defendants had acted in good faith to sell the Property to an unrelated party at market value.   In arriving at

---

[39] For the purposes of this analysis, the Court will assume that a foreclosure sale could not have resulted in a profit for NHX.

[40] At times, Defendants contend that the sales price would have needed to exceed $15.6 million to generate a profit because Defendants would have been entitled to a $1.4 million repayment for equity invested before profits could be shared.   (See Doc. no. 94 at 18 n.2)   At other times, Plaintiffs argue that the sales price would have needed to exceed $15 million to generate a profit.   (See, e.g., Doc. no. 113 at 6.)   Some testimony indicates that Defendants had about $1.7 million in equity invested, (Timberlake Aff. ¶ 10), which presumably would have required a $15.9 million sale to generate a profit.   However, factually and legally, Defendants have not sufficiently shown why they would have been entitled to this payout prior to a profit distribution to Plaintiffs.   And even assuming that the profit threshold was about $16 million, this would not change the Court's analysis, as described infra.

this conclusion, the Court focuses on two important breaches of the implied covenant of good faith: (1) failure to disclose the November 2010 LOI to Everson Huber, and (2) failure to inform Compass Bank about the Electrolux Lease signed in February 2011.

### i. Failure to Disclose the Electrolux LOI

Defendants' failure to disclose the November 2010 LOI to Everson Huber had a critical impact on Compass Bank's approval of the $8 million Short Sale.  Garcia testified that she relied solely on Everson Huber's December 2010 Appraisal (finding an $8 million "as is" value) in assessing the value of the Property and deciding whether to approve the Short Sale.[41]  Importantly, the appraiser testified that LOIs can be considered in determining a property's "as is" value.  (Huber Dep. at 35-36.)  He also testified that a lease on the two-story building at $9 per square foot would have added substantial value to the Shopping Center.

---

[41] Defendants stress that they disclosed the November LOI to Garcia in January 2011 when they emailed BMP's Marketing Package to her.  However, because Garcia testified that she relied *solely* on the December 2010 Appraisal in valuing the Property and approving the Short Sale, the January 2011 email with the Marketing Package had no perceptible impact on the causal chain that led to the $8 million Short Sale.  Garcia stated that she communicated with BMP only to verify that Defendants were actively marketing the Property.  Also, had Defendants honestly and in good faith sought to inform Garcia about the November LOI, they could have included this critical fact in the text of an email as opposed to disclosing it in a 50-page email attachment.  Indeed, there is no evidence that Garcia ever read that disclosure or that Defendants ever followed up to verify that she knew about this valuable development.

Defendants also stress that BMP used the Marketing Package (disclosing the November LOI) to directly market the Property and Harrell submitted the *only* written offer to buy the Property.  Plaintiffs counter that Everson Huber determined that a reasonable exposure period in the open market would have been twelve months (or less if aggressively marketed on multiple online services and through commercial brokers).  Here, the Property was only marketed for thirty days and was not listed online.  In response, Defendants point out that the appraiser also testified that it is not always necessary to market for twelve months to reach market value.  (Huber Dep. at 44.)  These arguments are better suited for trial than summary judgment.

(Id. at 16.)   Indeed, the CBRE appraisal, which considered the potential value of Electrolux Lease and its contingencies, arrived at an "as is" value of $22.65 million.   Although the CBRE Appraisal considered a signed lease as opposed to a less valuable LOI, the $22.65 million valuation is *much higher* the $14.2 million profit threshold.   Additionally, the signed Electrolux Lease contained substantially the same contingencies that were present in the November LOI.

Based on this evidence, a jury could reasonably infer that disclosure of the November LOI would have caused Everson Huber to appraise the Property at an "as is" value above the $14.2 million profit threshold.   As Compass Bank had an incentive to minimize its losses on the Original Loan, a jury could also reasonably conclude that Compass Bank would not have settled for a forced sale below the profit threshold.   After all, Garcia testified that she relied solely on the December 2010 Appraisal in valuing the Property and deciding whether to approve the Short Sale.

### ii.   Failure to Disclose the Electrolux Lease

More importantly, Defendants did not disclose the Electrolux Lease to Compass Bank once it was eventually signed.   Even with its contingencies,[42] the Electrolux Lease was highly valuable.   The

---

[42] Defendants emphasize that the Electrolux Lease contained significant contingencies, but there is also significant evidence showing that it was always expected that those contingencies would be met.   See supra Section I.A.7.   Also, Blum testified that "he had enough reasoning to believe that the remaining conditions would be resolved" when Atlantic Capital Bank authorized the $14.5 million loan based on the CBRE Appraisal.   (Blum Dep. at 32.)   The amount of damages is for the jury to decide, and the Electrolux Lease contingencies do not negate this triable issue.

Electrolux Lease's assignment clause – granting NHX an "absolute, unequivocal right to assign or transfer its interest" and mandating that Electrolux's obligations would be "unaffected" by an assignment – assured that the Electrolux Lease would have been equally valuable to an unrelated third party purchaser. The Electrolux Lease terms would generate almost $1 million per year in rental revenue for at least ten years.[43]   The CBRE Appraisal, which considered the potential value of the Electrolux Lease, valued the Property at $22.5 million.   Atlantic Capital Bank was willing to make a $14.5 million loan based on the CBRE Appraisal. An additional appraisal, performed after this litigation commenced by Plaintiffs' expert, concluded that the "as is" value of the Property with the Electrolux Lease was $19,985,000.   (Doc. no. 34, Ex. 1.)   Finally, Everson Huber's July 2010 Appraisal gave the Property a $14 million "as stabilized" value assuming that the two-story building would be leased at $3-$5 per square foot (based upon an LOI).   Given that Electrolux agreed to pay $9 per square foot, one could readily infer that the Property's market value was much higher than $14 million once the Electrolux Lease was signed in February 2011.

Based upon this evidence, a jury could reasonably infer that the Property's market value exceeded the $14.2 million profit threshold once the Electrolux Lease was signed.   Defendants argue

---

[43] In assessing the value of commercial real estate similar to the Shopping Center, the income capitalization approach is the most important of the three approaches used by appraisers.   (Huber Dep. at 15-16; Doc. no. 34, Ex. 1 at 3.)

that this is too speculative. However, this inference is not based upon "pure conjecture and speculation" or a "mere scintilla of evidence."[44] Cf. Martinez v. Burns, 459 Fed. Appx. 849, 850 (11th Cir. 2012); Daniels v. Twin Oaks Nursing Home, 692 F.2d 1321, 1324 (11th Cir. 1982). Here, there are three appraisals all reasonably supporting the conclusion that the Property's value exceeded $14.2 million.

As a matter of comparison, the Court offers Brooks v. Dime Sav. Bank of N.Y., FSB, 217 Ga. App. 441, 442 (1995), which involved a fraud claim against a developer who allegedly conspired to artificially inflate the sales price of a home using a straw man. The Georgia Court of Appeals affirmed summary judgment because the Plaintiffs had "no evidence of what their homes were actually worth at the time of purchase. Instead, they have appraisals from more than a year later, without any expert testimony describing fluctuations in the market and explaining how the factfinder can use the later appraisals to estimate value at the earlier point in time." Id. at 442. Here, in contrast, three of the four relevant appraisals are temporally proximate to the date of the Short Sale, and Plaintiffs have an expert who can explain their significance to the jury.

---

[44] "An inference is not unreasonable simply because it is based in part on conjecture, for an inference by definition is at least partially conjectural. Yet a jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility. Unavoidably, [i]n deciding how much the jury can speculate . . . [t]he line of demarcation which we are required to walk is ephemeral." Daniels, 692 F.2d at 1326 (citation and quotation omitted).

On February 4, 2011, the Electrolux Lease was signed.   On February 9, 2011, Defendants agreed to sell the Property to Harrell for $8 million and sent Compass Bank a settlement proposal.   On April 22, 2011, the Short Sale occurred and Compass Bank settled with Defendants.   Had Defendants honestly and in good faith sought to generate a profit for NHX (and thus Plaintiffs), Defendants would have directly informed Compass Bank about the signed Electrolux Lease.

Given that Compass Bank had an incentive to minimize its losses on the Original Loan and maximize the sales price at the forced sale, a jury could reasonably conclude that it would not have approved the Short Sale.   And given the patently valuable terms of the Electrolux Lease, a jury could reasonably conclude that Compass Bank probably would have had the Property reappraised and extended the marketing period.[45]   It is undisputed that Defendants never attempted to market the Property with the signed Electrolux Lease in hand (besides to Harrell).   The above-referenced appraisals show that marketing the Property with the Electrolux Lease would probably have generated a sales price exceeding the $14.2 million profit threshold.   In conclusion and drawing all justifiable inferences in favor of Plaintiffs, NHX would likely have generated a profit had Defendants acted in good

---

[45] A jury could also reasonably conclude that Defendants should have sought an extension of the marketing period to capture the millions of dollars in new value generated by the Electrolux Lease.   Instead, Defendants opposed even the 30-day marketing period.

faith and fair dealing.[46] Thus, Plaintiffs' injury resulted naturally and probably from Defendants' breach, and the question of actual damages should be answered by a jury.

### b. Nominal Damages

"In every case of breach of contract, the injured party has a right to damages, but if there has been no actual damage, the injured party may recover nominal damages sufficient to cover the costs of bringing the action." O.C.G.A. § 13-6-6.

> Nominal damages . . . are not given as compensation for the breach of a contract, but simply in vindication of the right of a person who brings an action upon a good cause, but fails to prove that he has sustained any actual damage, and to prevent his being mulcted in the costs after he has established his cause of action.

Brock v. King, 279 Ga. App. 335, 342 (2006), aff'd, 282 Ga. 56 (2007). Thus, under Georgia law, it is not necessary to prove actual damages to recover on a breach of contract claim. See id. at 341; see also Eastview Healthcare, LLC v. Synertx, Inc., 296 Ga. App. 393, 398-99 (2009) (holding that once the plaintiff shows the existence of a valid contract and evidence of breach, "the defendant is not entitled to summary judgment on the claim, even if the plaintiff fails to present any admissible evidence to

---

[46] Defendants argue that too many inferences must be stacked to reach this conclusion. To illustrate this point, Defendants artfully analogize Plaintiffs' case to the famous poem in which King Richard's kingdom was lost "all for the want of a horse-shoe nail." (See Doc. no. 107 at 1 (citing Shakespeare, *Richard III*, Act V, Scene 4)). However, "[a]ccording to federal law, there is no prohibition against pyramiding inferences; instead all inferences are permissible so long as they are reasonable." Daniels, 692 F.2d at 1324. In this case, each and all of the inferences required to be drawn to find that Plaintiffs suffered an injury are reasonable and fairly supported by evidence, even though contrary inferences might also be reasonably drawn. See id. at 1325.

establish the amount of actual damages flowing from the breach");
Poe v. Sears, Roebuck & Co., Inc., 1 F. Supp. 2d 1472, 1477 (N.D.
Ga. 1998) ("The possible recovery of nominal damages is sufficient
to preclude summary judgment [on a breach of contract claim].").

Having already determined that a jury could reasonably
conclude that Defendants breached the implied covenant of good
faith and fair dealing, the question of nominal damages shall also
proceed to trial. Although Plaintiffs' Complaint "sought only
actual damages, 'it is not necessary to pray specifically for
general or nominal damages in order to present a question for the
jury as to nominal damages.'" Duke Galish, 308 Ga. App. at 322
(quoting Brock v. King, 279 Ga. App. at 342 n.22).

### c. *Punitive Damages*

Plaintiffs' Complaint prays for punitive damages. "Unless
otherwise provided by law, exemplary damages shall never be
allowed in cases arising on contracts." O.C.G.A. § 13-6-10.
Punitive damages are not recoverable for breach of contract "even
if the breaching party acted in bad faith." Paul Dean Corp. v.
Kilgore, 252 Ga. App. 587, 593 (2001). "If, however, there is
evidence of fraud, punitive damages can be awarded, as fraud
constitutes tortious conduct." Id.

Even though there may be evidence of bad faith, the Court
cannot allow Plaintiffs to recover punitive damages on their
breach of contract claim. And, as is discussed in Section IV.C,
Plaintiffs do not have a viable fraud claim. Accordingly,

Plaintiffs are precluded from recovering punitive damages in this action.

### d. Reasonable Attorney's Fees and Expenses

Plaintiffs allege two grounds for recovering reasonable attorney's fees and expenses of litigation.   (Compl. ¶¶ 21-22.) First, Section 17.14 of the Original Agreement provides:

> In the event that either party shall bring an action or legal proceeding for an alleged breach of any provision of this Agreement . . . or to enforce, protect, determine, or establish . . . the rights hereunder of either party, the prevailing party shall be entitled to recover from the non-prevailing party, as a part of such action or proceedings, or in a separate action brought for that purpose, reasonably attorneys' fees and costs, expert witness fees and court costs as may be fixed by the court or jury.

(Doc. no. 1 at 24.)  As to this contractual basis for attorney's fees, it has not yet been determined who is the "prevailing party."  That matter will likely be decided at the conclusion of trial.

Second, Plaintiffs allege and argue that Defendants have acted in bad faith, been stubbornly litigious, and caused Plaintiffs unnecessary trouble and expense.  Defendants sole argument against attorney's fees and expenses is that Plaintiffs' underlying claims are not viable and the claim for attorney's fees is merely derivative.

O.C.G.A. § 13-6-11 provides that in breach of contract actions, "expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has

acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them." This statute requires a valid underlying claim to support a fee award. Gilmour v. Am. Nat'l Red Cross, 385 F.3d 1318, 1324 (11th Cir. 2004). Further, the plaintiff must prove that the defendant acted in bad faith, was stubbornly litigious, or caused plaintiff unnecessary trouble or expense. APAC-Se., Inc. v. Coastal Caisson Corp., 514 F. Supp. 2d 1373, 1382 (N.D. Ga. 2007). An award under Section 13-6-11 must relate to conduct arising from the underlying cause of action being litigated, as opposed to conduct during the course of litigation. Id. n.10.

Here, Plaintiffs have prayed for reasonable attorney's fees and may have a valid breach of contract claim. For the same reasons the Court concluded that Defendants may have breached the implied covenant of good faith in Section IV.B.1.b, the Court concludes that there is sufficient evidence for a jury to reasonably conclude that Defendants acted in bad faith under O.C.G.A. § 13-6-11. The question of reasonable attorney's fees shall proceed to trial.

### C. Fraud

#### 1. Concealment From Raiford

To establish fraud, Plaintiffs must prove five elements: "(1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act

64

or refrain from acting; (4) justifiable reliance; and (5) damages." Payne v. Harbin, 254 Ga. App. 402, 404 (2002).

### a. Concealment

"Suppression of a material fact which a party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." O.C.G.A. § 23-2-53. A relationship is deemed confidential where, inter alia, "one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another." O.C.G.A. § 23-2-58. "Furthermore, concealment of material facts may amount to fraud when direct inquiry is made, and the truth evaded." Am. Petroleum Products, Inc. v. Mom & Pop Stores, Inc., 231 Ga. App. 1, 5 (1998) (quotation omitted).

Here, there is evidence that Defendants, as members and managers of NHX, were situated in a position to exercise a controlling influence over Plaintiffs' 15% equity interest in NHX. Thus, Defendants had an obligation to communicate material facts to Plaintiffs. The Court further concludes that the terms of Electrolux's November LOI and the actual Electrolux Lease would constitute material information that should have been – but was not – disclosed to Plaintiffs. Furthermore, Raiford (and Brown acting on behalf of Raiford) made several direct inquiries about leasing prospects and prospective tenants, and Defendants evaded these inquiries. See Section I.A.8. Therefore, a jury could

reasonably conclude that Defendants fraudulently concealed material information from Plaintiffs.

### b. **Proximate Causation and Actual Damages**

The Court pretermits the elements of scienter, intent, and justifiable reliance because the fraud claim turns on damages and proximate causation. "In order to establish actionable fraud, plaintiffs must show that they have been damaged by the allegedly fraudulent misrepresentation: Fraud without damage, or damage without fraud, gives no cause of action, but when these two concur an action lies." Brooks, 217 Ga. App. at 442 (quotation omitted). Thus, "a plaintiff must prove that the alleged misrepresentation or omission proximately caused his or her injury." Greenwald v. Odom, 314 Ga. App. 46, 60 (2012). Proximate cause is generally "reserved for the jury," but can be "appropriately addressed on summary judgment in plain and indisputable cases." Id. And if the damage incurred is "only the imaginary" result of a tortious act, "such damage is too remote to be the basis of recovery against the wrongdoer." O.C.G.A. § 51-12-8.

To the extent that Plaintiffs have suffered damages, it is because NHX sold its only asset and did not generate a profit. At that point, Plaintiffs' 15% equity interest in NHX lost all its value. However, there is no causal connection between Defendants' failure to inform *Plaintiffs* about the Electrolux information and these damages. Plaintiffs concede that they had no voting or management rights in NHX. Thus, even if Defendants had told

Plaintiffs about the Electrolux LOI and Lease, Plaintiffs had no way to influence Defendants' decision to sell the Property below the $14.2 million profit threshold.

While Plaintiffs concede that they had no voting or management rights in NHX, they argue that they had the right to approve the sale of the Shopping Center under O.C.G.A. § 14-11-308(b)(3). That subsection declares: "Unless otherwise provided in the articles of organization or a written operating agreement [of the LLC], the unanimous vote or consent *of the members* shall be required to approve the . . . sale, exchange, lease, or other transfer of all or substantially all of the assets of the limited liability company." Id. (emphasis added). This statutory approval right applies only to an LLC "member" which is defined as "a person who has been admitted to a limited liability company as a member as provided in Code Section 14-11-505." O.C.G.A. § 14-11-101. Section 14-11-505 provides that a person is admitted as a member of the LLC at the "time provided in and upon compliance with the articles of organization or a written operating agreement or, if the articles of organization and any written operating agreement do not so provide, when the person's admission is reflected in the records of the limited liability company."

NHX's operating agreement does not designate Raiford or BTR as a member. (See Abernathy Dep., Ex. 3.) NHX's articles of organization are not in the record. Nor have Plaintiffs otherwise shown that their admission as members was "reflected in the

records" of NHX.   Finally, the Second Amended Agreement granted Plaintiffs a 15% equity interest in NHX, but it did not purport to grant Plaintiffs membership status in the LLC.   Thus, Plaintiffs had no right to approve the sale of the Shopping Center under O.C.G.A. § 14-11-308(b)(3).   This reinforces the conclusion that Plaintiffs had no way to prevent Defendants' decision to sell the Property below the $14.2 million profit threshold even if Plaintiffs had known about the Electrolux Lease.   Plaintiffs have failed to show how Defendants' concealment of the Electrolux information from Plaintiffs proximately caused the alleged injury. Any causal connection is only imaginary or speculative.   Without proximate causation, Plaintiffs' fraud claim cannot survive summary judgment.   Greenwald, 314 Ga. App. at 60.

To the extent that Plaintiffs argue that the alleged concealment served to deter Plaintiffs from joining Defendants' new entity (2701 Partners), Plaintiffs have not shown the Court that they had any legal right to become a member of that new entity. Therefore, deprivation of that opportunity cannot be considered an injury warranting damages.   Fraud without damages is not actionable.   Brooks, 217 Ga. App. at 442.

The Court's conclusion that Plaintiffs may have a claim for contractual damages is not inconsistent with summary judgment on the fraud claim.   The contractual injury, NHX's failure to generate a profit, was caused by Defendants' alleged breach of the implied covenant of good faith – primarily, by concealing the

Electrolux Lease *from Compass Bank* and selling the Property for an artificially low price.  Those damages, however, were not caused by concealment of information from Raiford and Brown.  Nor can actionable fraud be premised upon mere failure to perform a contract unless the promisor had an intent to not perform at the time of contracting.  See Hines v. MidFirst Bank, No. 1:12-cv-2527, 2013 WL 609401, at *6 (N.D. Ga. Jan. 8, 2013); Ultrasound Imaging Corp. v. Hyatt Corp., No. 1:06-cv-2778, 2009 WL 3029763, at *11 (N.D. Ga. Sept. 22, 2009).

### c. General Damages

"In the absence of specific proof of the amount of damages flowing from a tortious act," general damages – such as nominal and punitive damages – may be inferred, "but the defendant's liability for the damages must be established, including proof that the tortious act was the proximate cause of some actual loss." Whiteside v. Decker, Hallman, Barber & Briggs, P.C., 310 Ga. App. 16, 20 (2011).  "Without proof of compensatory damages proximately caused" by a defendant's tortious act, there is "no basis for ancillary claims for punitive damages." Id.; see also JTH Tax, Inc. v. Flowers, 302 Ga. App. 719, 723 (2010) ("To establish a cause of action for fraud, a plaintiff must show that actual damages, not simply nominal damages, flowed from the fraud alleged.").  Because Defendants are not liable for fraud, Plaintiffs' prayer for ancillary punitive damages cannot prevail.

## 2. Concealment from Compass Bank

To the extent that Plaintiffs' fraud claim is premised on Defendants' concealment of information from Compass Bank, it also fails. Generally, "actionable fraud must be based upon a misrepresentation made *to* the defrauded party, and relied upon *by* the defrauded party." Florida Rock & Tank Lines, Inc. v. Moore, 258 Ga. 106, 106 (1988) (emphasis in original). However, not all cases "fit neatly within that traditional element," and the Georgia Supreme Court has carved out an exception where "A, having as his objective to defraud C, and knowing that C will rely upon B, fraudulently induces B to act in some manner on which C relies, and whereby A's purpose of defrauding C is accomplished." Id. at 106-07. The maker of the fraudulent representation must intend or have reason to expect that the misrepresentation "will be repeated or its substance communicated" by the third party to the plaintiff and that it will influence the plaintiff's conduct. Id. at 106 n.1.

Defendants may have made material misrepresentations or omissions to Compass Bank about Electrolux and their role in financing Harrell's purchase of the Property. However, there is no evidence that Defendants intended for Compass Bank to repeat these communications to Plaintiffs. Indeed, there is no evidence that Plaintiffs ever communicated with Compass Bank at all or otherwise relied on representations made by Compass Bank. Even applying the exception to the general rule that fraud must be

based upon a misrepresentation made to the defrauded party, Plaintiffs' fraud claim cannot prevail.

Because Plaintiffs have no viable claim for fraud under either theory, their fraud claim is **DISMISSED WITH PREJUDICE.**

### D. Specific Performance

Plaintiffs' claim for specific performance alleges that "Plaintiffs are entitled in equity to a 15% interest in the new limited liability company to which the [Shopping Center] has been transferred, without any accompanying financial responsibility." (Compl. ¶ 31.) Plaintiffs seek an injunction requiring Defendants to convey the 15% interest in the new entity to Plaintiffs. (Id. ¶ 32.) Defendants filed a counterclaim seeking to impose certain conditions upon Plaintiffs' 15% interest in NHEP if the Court were to grant Plaintiffs' specific performance claim. (Doc. no. 29.) Alternatively, Defendants argue that the specific performance claim must fail because (1) Plaintiffs still own 15% of NHX and there is no contractual right for the Court to enforce, and (2) damages at law constitute an adequate remedy and preclude specific performance. (Doc. no. 48, Ex. 1 at 7-8.)

The Second Amended Agreement granted Plaintiffs a 15% equity interest in NHX. While NHX no longer has any assets or value, Plaintiffs still own that 15% interest, and the Court cannot enforce that provision through an injunction. As to Plaintiffs' request for an injunction requiring Defendants to convey a 15% interest in the entity that owns the Shopping Center (currently

71

NHEP, as well as 2701 Partners which owns NHEP), Plaintiffs have not presented the Court with any authority showing that this relief would be proper. "Specific performance is an extraordinary, equitable remedy, which will be granted only if the complainant does not have an adequate remedy at law." Kirkley v. Jones, 250 Ga. App. 113, 115-16 (2001) (citing O.C.G.A. § 23-2-130). "It is not a remedy that either party can demand as a matter of absolute right and will not be granted in any given case unless strictly equitable and just." Id. As Plaintiffs have an adequate remedy at law - damages for breach of contract - the claim for specific performance is **DISMISSED WITH PREJUDICE**. As a result, Defendants counterclaim (doc. no. 29) is now moot and also **DISMISSED WITH PREJUDICE.**

### E. Tortious Interference with Contract

Plaintiffs concede that their claim for tortious interference with contract is not viable. (Doc. no. 80 at 13.) Accordingly, Plaintiffs' claim for tortious interference is **DISMISSED WITH PREJUDICE.**

## V. CONCLUSION

For the reasons set forth above, Plaintiffs' objections to the Magistrate Judge's Order denying Plaintiffs' motion to amend (doc. no. 105) are **OVERRULED**. Plaintiffs' motion to strike Defendants' motion for summary judgment (doc. no. 61) is **DENIED**. Defendants' motion for summary judgment (doc. no. 48) is **GRANTED**

**IN PART AND DENIED IN PART**.  Specifically, Plaintiffs' claims for fraud, specific performance, and tortious interference with contract are **DISMISSED WITH PREJUDICE**.  Defendants' counterclaim (doc. no. 29) is **DISMISSED WITH PREJUDICE**.  Plaintiffs' claim for breach of contract will proceed to trial.  Plaintiffs' motion for a hearing (doc. no. 79) is **DENIED AS MOOT**.

   **ORDER ENTERED** at Augusta, Georgia, this _27th_ day of March, 2013.


                    HONORABLE J. RANDAL HALL
                    UNITED STATES DISTRICT JUDGE
                    SOUTHERN DISTRICT OF GEORGIA