IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

J. WAYNE RAIFORD and B, T & R        *
ENTERPRISES, LLC,                    *
                                     *
        Plaintiffs,                  *
                                     *
            v.                       *
                                     *
NATIONAL HILLS EXHANGE, LLC;         *
SNELLVILLE CORSSING, LLC;            *          1:11-cv-152
RICHARD D. SWOPE; RONALD J.          *
DeTHOMAS; JAMES S. TIMBERLAKE;       *
THOMAS L. ABERNATHY; and             *
STEVEN E. GAUNTLEY,                  *
                                     *
        Defendants.                  *
                                     *
                                     *
                                     *

-------------------

**O R D E R**

-------------------

Presently before the Court are Plaintiffs' Daubert motions

to exclude expert opinion testimony offered by Defendants James

Timberlake and Richard Swope and attorney Jack Paller. (Docs.

183, 185, 186.) The Court **GRANTS** each of Plaintiffs' motions.

**I.    FACTUAL BACKGROUND**

The Court's March 27, 2013 Order contains a factual summary

of this case. On February 20, 2015, Defendants disclosed six

fact witnesses who "may give expert opinions." (Defs.' Expert

Disclosures, Doc. 185.) Because Defendants did not retain these

experts, their disclosures were timely under Federal Rule of

Civil Procedure 26(a)(2)(C). Among the six disclosed witnesses were Defendants Jim Timberlake and Richard Swope and attorney Jack Paller. (Defs.' Expert Disclosures ¶¶ 2-3, 6.)

According to the disclosures, Timberlake and Swope "may give opinion testimony concerning commercial real estate values and marketability in Georgia in 2010 and 2011, the difficulty of obtaining financing for Georgia commercial real estate projects in 2010 and 2011, and the value of the National Hills Shopping Center in 2010 and 2011." (Id. ¶¶ 2-3.) Timberlake and Swope base their opinions on their general real estate experience and "personal experience with National Hills Shopping Center." (Id.) As for Paller, according to the disclosure, he was involved in "the negotiations and documentation of agreements with Electrolux and Fresh Market for National Hills Shopping Center." (Id. ¶ 6.) Defendants' disclosure states that Paller "may give opinion testimony concerning the complexities of the negotiations to meet the contingencies of the Electrolux lease and how satisfying those terms and conditions compared to his previous experiences." (Id.)

Plaintiffs moved to exclude Timberlake, Swope, and Paller from testifying as experts under Federal Rule of Evidence 702. (Docs. 183, 185, 186.)

## II.   LEGAL STANDARD

Federal Rule of Evidence 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"As the Supreme Court recognized in Daubert v. Merrell Dow Pharms., Inc., [509 U.S. 579 (1993)], Rule 702 plainly contemplates that the district court will serve as a gatekeeper to the admission of [expert] testimony." Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340 (11th Cir. 2003). "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999).

The Eleventh Circuit has explained that district courts are to engage in a three-part inquiry to determine the admissibility of expert testimony under Rule 702. Quiet Tech., 326 F.3d at 1340. Specifically, the court must consider whether:

> (1) The expert is qualified to testify
> competently regarding the matters he intends
> to address; (2) the methodology by which the
> expert reaches his conclusions is
> sufficiently reliable as determined by the
> sort of inquiry mandated in Daubert; and (3)
> the testimony assists the trier of fact,
> through the application of scientific,
> technical, or specialized expertise, to
> understand the evidence or to determine a
> fact in issue.

Id. at 1340-41.

First, an expert may be qualified to testify due to his knowledge, skill, experience, training, or education. Trilink Saw Chain, LLC v. Blount, Inc., 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008). A witness's qualifications must correspond to the subject matter of his proffered testimony. See Jones v. Lincoln Elec. Co., 188 F.3d 709, 723 (7th Cir. 1999).

Second, the testifying expert's opinions must be reliable. In Daubert, the Supreme Court directed district courts faced with the proffer of expert testimony to conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592-93. There are four factors that courts should consider: (1) whether the theory or technique can be tested; (2) whether it has been subject to peer review; (3) whether the technique has a known or potential rate of error; and (4) whether the theory has attained general acceptance in the relevant community. Id. at 593-94. "These factors are

illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004). Thus, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).

Regardless of the specific factors considered, "[p]roposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known." Daubert, 509 U.S. at 590. In most cases, "[t]he expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." Fed. R. Evid. 702, advisory committee's notes (2000 amendment). "Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough" to carry the proponent's burden. Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla., 402 F.3d 1092, 1113 (11th Cir. 2005). Thus, neither an expert's qualifications and experience alone nor his unexplained assurance that his or her opinions rely on accepted principles is sufficient. McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1244 (11th Cir. 2005); Frazier, 387 F.3d at 1261. Moreover, when analyzing a witness's reliability, courts

must be careful to focus on the expert's principles and methodology rather than the conclusions that they generate. Daubert, 509 U.S. at 595.

Third, expert testimony must assist the trier of fact to decide a fact in issue. Thus, the testimony must concern matters beyond the understanding of the average lay person and logically advance a material aspect of the proponent's case. Frazier, 387 F.3d at 1262; Daubert, 509 U.S. at 591. The Supreme Court has described this test as one of "fit." Daubert, 509 U.S. at 591. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262-63.

## III. DISCUSSION

Plaintiffs seek to exclude expert opinion testimony from Defendants Jim Timberlake and Richard Swope and attorney Jack Paller. From Defendants' disclosure, it appears they expect Timberlake, Swope, and Paller to each testify as fact witnesses and as expert opinion witnesses. Plaintiffs' motions initially focused on excluding their expert testimony under Rule 702. In their reply briefs, Plaintiffs broadened their arguments to exclude the opinion testimony altogether under Rule 701 as well. The Court addresses each argument in turn.

## A. Opinion Testimony of Jim Timberlake

Defendants indicate that Defendant Jim Timberlake may give opinion testimony on three topics: (1) commercial real estate values and marketability in Georgia in 2010 and 2011; (2) the difficulty of obtaining financing for Georgia commercial real estate projects in 2010 and 2011; and (3) the value of the National Hills Shopping Center in 2010 and 2011. (Defs.' Expert Disclosures ¶ 2.) More specifically, Timberlake intends to offer the following opinions. First, during 2010 and 2011, the market for commercial real estate was "very difficult" and featured "a number of bank failures," which presumably was detrimental to the value of commercial real estate in Georgia. (Defs.' Opp. Br., Doc. 194 at 3 (quoting Timberlake Dep., Doc. 201 at 6.)) Second, Timberlake will testify to the difficulty of obtaining financing for commercial real estate in Georgia during 2010 and 2011. (Id. at 4.) Finally, according to Defendants, Timberlake will testify that "the shopping center was worth no more than $8,000,000 at the time of the forced sale." (Id. at 5.) Plaintiffs challenge the admissibility of these opinions under Rule 702 for being unhelpful to the jury, not based on specialized knowledge, and not based on reliable methods.

Timberlake's first opinion concerns commercial real estate values and marketability in Georgia in 2010 and 2011. During his deposition, Timberlake testified that in 2010 and 2011 the

commercial real estate market was "very difficult" and included a "number of bank failures." (Timberlake Dep. at 6.) At no point did Timberlake explain the facts or data he relied on or any scientific, technical or specialized knowledge he applied to form this opinion. Further, the lack of any reliable methodology is evident from the face of his deposition transcript. These opinions, therefore, fail to satisfy Rule 702.

On the second topic, Defendants do not point to a particular opinion that Timberlake intends to give. From the Court's review of Timberlake's deposition, he does not appear to have an expert opinion on the difficulty in obtaining financing. Mr. Timberlake does, however, speak at length regarding the difficulty securing financing to fund improvements at National Hills during 2011. (Timberlake Dep. at 12-14, 18-19, 24, 39-40, 70-71.) These opinions are based on Timberlake's personal involvement with National Hills Exchange, LLC ("NHX") and not a reliably applied methodology, and are therefore the proper subject of lay opinion testimony under Rule 701 and not expert testimony under Rule 702.

Finally, Defendants disclosed that Timberlake has an opinion concerning the value of National Hills at the time of the short sale in April 2011. The exact contents of Timberlake's opinion were the cause of some confusion during his deposition. Plaintiffs' counsel repeatedly asked Timberlake

what his opinion was as to the value of National Hills at the time of the short sale, and at other occasions relevant to this litigation. (E.g., Timberlake Dep. at 27-28, 40-41.) Each time Timberlake declined to give an opinion and suggested that he needed to consult the property's net operating income and capitalization rates among other documents before he could form one. (Id.)

After some confusion concerning when Timberlake would be prepared to give an opinion on National Hills' value (id. at 59-60), Defense counsel stated that "[Timberlake] can give his opinion as to maximum values as of the time in April of 2011 when it was sold to Harrell." (Timberlake Dep. at 60.) He continued, "[Timberlake] . . . is going to testify [that] he has an opinion that [National Hills] had a value no greater than a certain amount." (Id. at 61.) Plaintiffs' counsel responded – correctly – that "[Timberlake] said . . . he has no idea without having all the cap rates and all the leases and all that information." (Id.) After this short detour, Timberlake and Plaintiffs' counsel had the following exchange:

> Q: Do you have any opinion as to the value
> on the day you sold – the day that National
> Hills Exchange sold to Richard Harrell,
> which is, I believe, April of 2011?
>
> A: [M]y opinion is that we sold it to him
> for the number that the market dictated
> given market circumstances.

9

Q:   The sales price was $8,000,000; is that correct?

A:   I think that's right.

Q:   So your opinion is it had a value as of that time of $8,000,000?

A:   That's what the appraisal said.  I mean, personally I felt like it had a lot more potentially; but we didn't have the leases to do it, so – to take the value up.

.  .  .

Q:   Do you have an opinion today as to the valuation of National Hills Shopping Center during that time period?  Either you do or you don't.

A:   I have an opinion that we sold the property [to] Richard Harrell for what I thought was a market driven number at the time we sold it to him.  Was I happy with it, no.  Would I have liked to have seen it higher so that we could have had less of a deficiency, yes.  But did we get offers higher than that, no.

(Timberlake Dep. at 61-62, 66.)  In their brief, Defense counsel cites these statements as support for Timberlake's supposed opinion that National Hills was worth "no more than $8,000,000" in April 2011.  (Defs.' Opp. Br., Doc. 194 at 5-6.)

As an initial matter, Timberlake never testified that National Hills was worth "no more than $8,000,000."  Timberlake twice denied possessing an opinion on National Hills' value in April 2011.  (Timberlake Dep. at 28, 40-41.)  After some confusion, and after Defense counsel explained Timberlake's opinion, Timberlake reluctantly embraced it, stating that "[NHX] sold the property [to Richard Harrell for what [Timberlake]

thought was a market driven number . . . ." (Id. at 66.)
Because, as a matter of fact, NHX sold the property to Harrell
for $8,000,000, Defendants interpret this statement to mean that
Timberlake has an opinion that the property was worth no more
than $8,000,000. But earlier in the deposition, Plaintiffs'
counsel asked Timberlake, "did you think the shopping center had
a value in excess of 8,000,000 or perhaps below 8,000,000?"
(Id. at 41.) Timberlake replied that he "would have to look at
cap rates and look at the income stream at that point." (Id.)
Given Timberlake's earlier assertion that to form an opinion he
would have to consult net operating income figures and
capitalization rates among other documents, the Court is
skeptical whether an opinion that National Hills was worth no
more than $8,000,000 can even be attributed to him.

Assuming that Timberlake has such an opinion, he does not
use any technical or specialized knowledge to arrive at it. To
the extent Timberlake explains any method, it is that the market
value of a property at the time of sale is simply what its
purchaser paid for it. Applying this method here, Timberlake
suggests, but never fully states, that the market value of
National Hills at the time of the short sale was $8,000,000
because that is the price Harrell, via NHEP, paid for it. This
"method" is not based on technical or specialized knowledge,
and, moreover, is not beyond the comprehension of a juror.

Elsewhere, Timberlake suggests that National Hills' value was $8,000,000 in April 2011 because that is what an appraisal said. (Id. at 62.) Timberlake is only relaying the appraiser's expert opinion and not giving his own. Moreover, Timberlake may not agree with the appraiser's view. He stated that $8,000,000 is "what the appraisal said," but that "personally [he] felt like [National Hills] had a lot more [value] potentially; but [they] didn't have the leases to do it, so – to take the value up." (Id.) Arguably, Timberlake is stating his view that the appraiser underestimated National Hills' market value by failing to account for the possibility of leasing more retail space in the furture.

As the above show, his opinion regarding National Hills' value, to the extent he has one, is not based on a reliably applied methodology that utilizes technical or specialized knowledge. Rather, his opinion is based on his personal familiarity with prior appraisals, National Hills' tenants, and market conditions. Accordingly, it is the proper subject of lay opinion testimony under 701, but not expert opinion testimony under 702.

Timberlake may have opinion testimony on each of the three topics discussed above. To the extent those opinions exist, they are based on his perspective as a key figure in this case, see Federal Rule of Evidence 701(a), and do not involve the application of "scientific, technical, or other specialized

knowledge." Fed. R. Evid. 702(a). The opinions are therefore the proper subject of lay, not expert, testimony. Accordingly, Plaintiffs' motion to exclude Jim Timberlake from testifying as an expert (Doc. 195) is **GRANTED**. Assuming Defendants lay a proper foundation at trial, Timberlake will be allowed to testify to his opinions on these topics as a lay witness.

### B. Opinion Testimony of Richard Swope

Defendants also indicate that Richard Swope may give expert opinion testimony on the same three topics as Timberlake. (Defs.' Expert Disclosures ¶ 3.) As with Timberlake, Plaintiffs challenge the admissibility of these opinions under Rule 702 as being unhelpful to the jury, not based on specialized knowledge, and not based on reliable methods.

On the first topic, Swope intends to testify to his opinion that "commercial real estate values and marketability in Georgia were 'severely depressed' in 2010 and 2011 as a result of the real estate crisis." (Defs.' Opp. Br., Doc. 192 at 3 (quoting Swope Dep., Doc. 200 at 49.)) Additionally, Swope will opine that lending "had come to a virtual standstill," and that "[o]nly in rare cases were loans being made for a period of time." (Swope Dep. at 40.) Finally, Defendants' brief asserts that Swope will opine that National Hills was "worth approximately $8,000,000 at the time of the forced sale." (Defs.' Opp. Br., Doc. 192 at 4.)

The Court begins with Swope's opinion concerning real estate values and marketability.  During Swope's deposition, Defense counsel asked Swope the following:

> Q:    Speaking in general terms, based on your ownership in other properties in 2010 or 2011 or investigation of other potential acquisitions, was it your view that commercial real estate property values were good or were they [depressed] in the period of time of late 2010 and early 2011?
>
> A:    They were severely [depressed].

(Swope Dep. at 49.)    Defendants have not provided any description of the method Swope used to reach his opinion that the market was severely depressed.  Undoubtedly, Swope's ability to analyze real estate market conditions is greater than the average person due to his professional experience in the field.  However, his silence as to his methodology renders his opinion unreliable as expert testimony.  Fed. R. Evid. 702(c).

Swope's second opinion concerns the difficulty in obtaining financing for commercial real estate projects in Georgia during 2010 and 2011.   In his deposition, Swope gave the following testimony:

> I do have an opinion about the general economy.   I do read the newspapers and I read multiple times that we were in the midst of the greatest recession since the great depression.   I can speak specifically to the difficulty as to the real estate market at the time where *lending had come to a virtual standstill.   Only in rare cases were loans being made for a period of time.*

(Swope Dep. at 40 (emphasis added)). He also testified that, unlike with previous loans, Atlantic Bank required Swope to give a joint and several guaranty. (Id. at 49.) That is the extent of Swope's testimony concerning the availability of loans. As the above shows, Swope's opinion concerning the standstill in lending is devoid of any technical methodology or specialized knowledge and appears to be based wholly on his personal experience with NHX and what he read in newspapers. In other words, his opinion is the proper subject of lay opinion testimony and is not appropriate as expert testimony under Rule 702.

Swope's third opinion concerns National Hills' market value. Defendants assert that Swope will opine that National Hills' market value was $8,000,000 at the time of the short sale. (Defs.' Opp. Br., Doc. 192 at 4.) In direct questioning, Swope testified concerning some factors that "would inform" or "would influence" his opinion. (Id. at 46-69.) But Swope repeatedly denied reaching a definite opinion concerning National Hills' valuation because he did not know the prevailing capitalization rates in April 2011. (Swope Dep. at 7-9, 44.) According to his own testimony, Swope had insufficient facts or data to reach a proper expert opinion as to the value of National Hills. See Fed. R. Evid. 702(b).

In conclusion, the Court **GRANTS** Plaintiffs' motion (Doc. 186) because Swope's proffered opinion testimony does not

15

satisfy the requirements of Federal Rule of Evidence 702. Swope will not be permitted to testify as an expert on these topics.[1]

### C. Opinion Testimony of Jack Paller

According to Defendants' disclosure, attorney Jack Paller "may give opinion testimony concerning the complexities of the negotiations to meet the contingencies of the Electrolux lease and how satisfying these terms and conditions compared to his previous experiences." (Defs.' Expert Disclosures ¶ 6.) Plaintiffs argue that Paller is unqualified to give the opinions because he lacks familiarity with the negotiations and because his legal experience is unrelated to his proffered opinions. Upon reviewing Paller's deposition, the Court agrees.

The first topic in Defendants' disclosure appears to address the complexity of the negotiations over the terms of the Electrolux Lease and the terms of the side agreements with Fresh Market and the Development Authority of Richmond County. Paller repeatedly explained that he did not negotiate the terms of the Electrolux Lease, Fresh Market's concessions, or the bond package with the Development Authority of Richmond County.

---

[1] In their reply brief, Plaintiffs argued that Swope's opinion regarding the value of National Hills is also inadmissible as lay opinion testimony under Rule 701 because "he is not in possession of sufficient information to allow him to form an estimate of value, and indeed specifically disclaimed having any [estimate]." (Pls.' Reply Br., Doc. 203 at 2.) At this time, and assuming a proper foundation is laid at trial, the Court permits Swope to offer his opinion regarding the value of National Hills as a lay witness.

(Paller Dep. at 6-7, 10, 12.) In general, he described his role as that of a "scrivener" who took the business terms that were negotiated by the parties and put them into "legalese." (Id. at 11, 14.) Paller does discuss exchanging drafts of the agreements with counsel for Electrolux and the Authority and representatives from Fresh Market. But Paller is clear that the sharing of these drafts was part of translating the earlier agreed terms into "legally enforceable documents and language." (Id. at 12.) Paller therefore disclaimed having an expert opinion concerning the complexity of the negotiations.

Defendants also argue that Paller's testimony will address the difficulty Defendants faced in satisfying the Electrolux Lease's contingencies. (Defs.' Opp. Br., Doc. 193 at 3.) Plaintiffs claim that whether or not Defendants would meet the contingencies are business matters not within Paller's legal experience, therefore rendering Paller unqualified as an expert. (Pls.' Mot. to Exclude Paller, Doc. 183, Ex. 1.)

The Court agrees with Plaintiffs. Whether the Electrolux Lease's contingencies would or would not be satisfied is ultimately a question of commercial real estate and not a matter of legal expertise. Accordingly, the Court finds that Paller

lacks the requisite expertise in commercial real estate to testify as an expert on this topic.[2]

To conclude, the Court **GRANTS** Defendants' motion to exclude Jack Paller from testifying as an expert.  (Doc. 183.)

## IV.   CONCLUSION

As discussed above, the Court **GRANTS** Plaintiffs' <u>Daubert</u> motions.   (Docs. 183, 185, 186.)   To the extent Plaintiffs' motions address lay opinion testimony under Rule 701, the Court **DENIES** the motions on those grounds.   Accordingly, Timberlake, Swope, and Paller will be permitted to give opinion testimony, but not as experts.

**ORDER ENTERED** at Augusta, Georgia, this  _17th_ day of May 2016.

_____
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

[2] Defendants' disclosure suggests that Paller will compare the difficulty of satisfying these contingencies with his previous experience.  (Defs.' Expert Disclosures ¶ 6.)   Paller could, for instance, discuss his previous experience with clients who were or were not able to satisfy similar contingencies in leases he drafted. Testimony comparing the difficulty of satisfying these contingencies to past successes or failures would assist the jury and would be based only on Paller's first-hand experience as his clients' attorney and not specialized knowledge in the commercial real estate field.   Such testimony would be suitable as lay opinion testimony. <u>See</u> Fed. R. Evid. 701.