IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

J. WAYNE RAIFORD and B, T & R     *
ENTERPRISES, LLC,                  *
                                   *
        Plaintiffs,                *
                                   *
            v.                     *
                                   *
NATIONAL HILLS EXHANGE, LLC;       *
SNELLVILLE CORSSING, LLC;          *        1:11-cv-152
RICHARD D. SWOPE; RONALD J.        *
DeTHOMAS; JAMES S. TIMBERLAKE;     *
THOMAS L. ABERNATHY; and           *
STEVEN E. GAUNTLEY,                *
                                   *
        Defendants.                *
                                   *

―――――――――

**O R D E R**

―――――――――

In April and May 2015, Plaintiffs filed three motions to
reconsider the Court's March 27, 2013 Order.  Specifically,
these motions seek reconsideration of the Court's denial of
Plaintiffs' motion to amend their complaint (Doc. 187); grant of
summary judgment in Defendants' favor on Plaintiffs' fraud claim
(Doc. 189); and dismissal of Plaintiffs' claim for equitable
relief (Doc. 184).   After setting out relevant background
information and the legal standard for reconsideration, the
Court addresses each of these motions separately.   The Court
**REINSTATES** Plaintiffs' claim for equitable relief (Count IV) and
**DENIES** the other motions.

# I. BACKGROUND

This case concerns a dispute between businesses and their members who are former and current owners of National Hills Shopping Center ("the Property"), located on Washington Road in Augusta, Georgia. The complete factual background is set out in the Court's March 27, 2013 Order. (Doc. 118 at 1-30.) Briefly, the Court summarizes the procedural history relevant to the present motions.

Plaintiffs' Complaint alleged four claims against Defendants: (1) breach of contract; (2) tortious interference with contract (3) fraud; and (4) specific performance. (Doc. 1 ¶¶ 20-32.) After the Court's deadline to amend, Plaintiffs moved to amend their Complaint to add claims for breach of fiduciary duty against Defendants Richard Swope, Ronald DeThomas, James Timberlake, Thomas Abernathy, and Steven Gaultney (collectively the "Individual Defendants"). (Doc. 45.) While Plaintiffs' motion was pending, Defendants filed their motion for summary judgment on Plaintiffs' four claims. (Doc. 48.) The Magistrate Judge then denied Plaintiffs' motion to amend, and Plaintiffs objected. (Docs. 102, 104.)

In its March 27, 2013 Order, the Court resolved Defendants' motion for summary judgment and Plaintiffs' objection to the Magistrate Judge's Order. Among other rulings that are not relevant here, the Court:

1. Overruled Plaintiffs' objections to the Magistrate Judge's Order denying Plaintiffs' motion to amend;
2. Granted summary judgment in Defendant's favor on Plaintiffs' fraud claim, claim for tortious interference with contract, and claim for specific performance;
3. Denied summary judgment on Plaintiffs' breach-of-contract claim.

(Order, Doc. 118 at 72-73.) Plaintiffs immediately sought reconsideration of the Court's grant of summary judgment on their fraud claim. (Doc. 119.) The Court denied that motion because Plaintiffs "[did] not establish any clear error or manifest injustice imposed by the Court's prior ruling." (Doc. 123 at 8.) Since that time, most of the Court's attention has been consumed with resolving discovery disputes. (E.g., Orders, Docs. 171, 176, 179, 181.) The present motions for reconsideration return the Court to the merits of this case.

## II. LEGAL STANDARD

"In considering a motion for reconsideration, a court must balance the need for finality and judicial economy against the need to render just decisions." Collins v. Int'l Longshoremen's Ass'n Local 1423, No 2:09-cv-093, 2013 WL 393096, at *1 (S.D. Ga. Jan. 30, 2013). District courts have the discretion to reconsider interlocutory orders at any time before final judgment under Rule 54(b). Watkins v. Capital City Bank, No. 3:10-cv-087, 2012 WL 4372289, at *4 (S.D. Ga. Sept. 24, 2012);

Lambert v. Briggs & Stratton Corp., No. 6:04-cv-016, 2006 WL
156875, at *1 (S.D. Ga. Jan. 19, 2006).

Although the text of Rule 54(b) does not specify a standard
to be used by courts in exercising authority under the Rule,
courts in this Circuit "have taken the position that a motion
for reconsideration should only be granted if there is (1) an
intervening change in controlling law; (2) newly discovered
evidence; or (3) the need to correct clear error or prevent
manifest injustice." Insured Deposits Conduit, LLC v. Index
Powered Fin. Servs., LLC, No. 07-22735, 2008 WL 5691349, at *1-2
(S.D. Fla. Mar. 14, 2008); accord Bryant v. Jones, 696 F. Supp.
2d 1313, 1320 (N.D. Ga. 2010); Merrett v. Liberty Mut. Ins. Co.,
No. 3:10-cv-1195, 2013 WL 5289095, at *1 (M.D. Fla. Sept. 19,
2013). The movant must set forth facts or law of a strongly
convincing nature to induce the Court to reverse its prior
decision, for reconsideration is an extraordinary remedy to be
employed sparingly. Voter Verified, Inc. v. Election Sys. &
Software, Inc., No. 6:09-cv-1969, 2011 WL 3862450, at *2 (M.D.
Fla. Aug. 31, 2011). A motion for reconsideration should not be
used to present arguments already heard and dismissed, or to
offer new legal theories or evidence that a party could have
presented before the original decision. S.E.C. v. Mannion, No.
1:10-cv-3374, 2013 WL 5999657, at *2 (N.D. Ga. Nov. 12, 2013).

## III. DISCUSSION

### A. Reconsideration of the Court's Denial of Plaintiffs' Motion to Amend

In the March 27, 2013 Order, the Court overruled Plaintiffs' objections to the Magistrate Judge's Order denying Plaintiffs leave to amend their Complaint. (Doc. 118.) Plaintiffs' motion for reconsideration requests permission to amend their Complaint in light of newly discovered evidence that Plaintiffs contend Defendants improperly withheld during discovery. Given Defendants' conduct during discovery, to deny the amendment, Plaintiffs argue, would amount to a manifest injustice.

Before addressing Plaintiffs' argument, it is worth restating the Court's reasons for overruling Plaintiffs' objections to the Magistrate Judge's Order. In the Court's March 27, 2013 Order, the Court acknowledged that Defendants failed to provide complete discovery responses; nevertheless, the Court found that, by January 10, 2012, the date Plaintiffs deposed Peter Blum, they had the necessary information to add a breach-of-fiduciary duty claim. (Order, Doc. 118 at 34-35.) As the Court explained, "[h]ad Plaintiffs exercised the requisite degree of diligence, they would have filed a breach of fiduciary duty claim soon thereafter," instead of waiting an additional four months. (Id. at 35.) Further, the Court observed that because Plaintiffs' lack information concerning these

5

transactions, diligence required them to seek earlier depositions to determine whether they should add additional claims. (Id. at 36-37.) The Court, therefore, overruled Plaintiffs' objections.

Plaintiffs now come forward with new evidence, gleaned from a forensic examination of Defendant Steve Gaultney's computer, which was conducted pursuant to the Court's May 15, 2014 Order. The evidence consists of an email chain between Gaultney and Richard Atkins, National Hills Exchange, LLC's ("NHX") CPA. Below the Court excerpts the relevant portion of Gaultney's March 21, 2011 email to Atkins:

> 2 – National Hills Exchange (which has Snellville Crossing as its managing member) will be selling the Property to NHEP, LLC. The current Partners of NHX will form a new entity, 2701 Partners LLC[.] 2701 Partners will then acquire the Assets of NHEP, LLC, but not under the same terms. I believe 2701 would be managing member of NHEP. The price will be marked up. The estimated asset repurchase is estimated to be $8.4m.

(Gaultney-Atkins Email Chain, Doc. 187-1, Ex. 1 at 2.) According to Plaintiffs, this email demonstrates that, as early as March 21, 2011, Defendants intended to enter into the precise straw transaction of which Plaintiffs accuse them. As this email appears to contemplate, NHX sold the Property to National Hills Exchange Partnership, LLC ("NHEP") on April 22, 2011. At approximately the same time, the Individual Defendants formed 2701 Partners LLC and contracted to lease and manage the

property for NHEP; and, 56 days after NHX sold the property to NHEP, Harrel sold his interest in NHEP to 2701 Partners. (Order, Doc. 118 at 12-16.) Plaintiffs consider this email "direct and primary evidence of Defendants' scheme to 'squeeze out' Plaintiffs from ownership of National Hills Shopping Center." (Doc. 187, Ex. 1 at 4.)

Plaintiffs acknowledge, however, that the Court's prior Order "separated the question of Defendants' [discovery] misconduct from the question of Plaintiffs' diligence and ruled against the motion for leave to amend solely on the ground of the latter." (Id. at 4-5.) Plaintiffs submit that separating the inquiry is not justified. Plaintiffs, using this email as evidence, now argue that reconsideration is warranted because Defendants' discovery misconduct is greater than initially thought and because the email expressly states Defendants' intent to squeeze Plaintiffs out. (Id. at 5.) According to Plaintiffs, failure to allow amendment would, in light of the new evidence, result in manifest injustice.

As the Court explained above, newly discovered evidence is one of the reasons the Court, in exercising its discretion, may reconsider a prior order. Insured Deposits Conduit, 2008 WL 5691349, at *1-2. Typically, on a motion for reconsideration, a movant resorts to new evidence when the Court's prior ruling addressed the merits of a claim. Here, Plaintiffs have presented new evidence supporting the claim that they wish to

add by amendment, which the Court did not permit as a procedural matter. Unfortunately for Plaintiffs, this new evidence does not dislodge the Court's prior conclusion that Plaintiffs failed to act with the necessary diligence to show good cause in amending their Complaint. As the Court previously found, Plaintiffs possessed the necessary information to amend their Complaint and add a claim for breach of fiduciary duty by January 10, 2012. Instead they waited until May 2012. Whether or not Defendants should have produced this email chain before January 2012 does not change the Court's conclusion they acted without the necessary diligence.[1] The Court **DENIES** Plaintiffs' motion to reconsider the denial of Plaintiffs' motion to amend. (Doc. 187.)

### B. Reconsideration of the Court's Grant of Summary Judgment on Plaintiffs' Fraud Claim

#### 1. Introduction

In the March 27, 2013 Order, the Court granted summary judgment in favor of Defendants on Plaintiffs' fraud claim (Count II). The Court's analysis on Count II relied heavily on what the parties represented was the correct operating agreement. Plaintiffs now request reconsideration of Section IV.C.1(b) of that Order in light of discovering a different

---

[1] In their briefs, the parties dispute whether this new evidence should have been produced in response to Plaintiffs' first request for production. The Court takes no position on that question.

operating agreement in *Brown v. Timberlake et al.*, which is currently pending in the Superior Court of Gwinnett County, Georgia.[2] Defendants now admit that the newly discovered operating agreement was in effect when Raiford acquired his interest in NHX. (Defs.' Opp. Br., Doc. 195 at 2.) In light of that new evidence, the Court has reconsidered its previous Order and substitutes this analysis, which addresses proximate causation for Plaintiffs' fraud claim, for Section IV.C.1(b) of the March 27, 2013 Order.

There are now three Operating Agreements at issue in this case. The Individual Defendants adopted NHX's first Operating Agreement in March 2007. (Timberlake Aff., Doc. 195, Ex. 1 ¶ 2.) The later amendments have made this Agreement largely irrelevant. To facilitate a transfer under § 1031 of the United States Internal Revenue Code, in August 2007, REES Holdings, LLC became the sole member of NHX and adopted the newly discovered Operating Agreement II. (Id. ¶ 4.) Defendants now admit this Agreement was in effect when Plaintiffs and NHX closed the sale and when BTR received a 15% equity ownership interest in NHX.

_____

[2] Plaintiffs and Defendants argue over whether Operating Agreement II should have been produced in this case. At this time, the Court takes no position on whether Plaintiffs' requests for production included this document. The Court notes, however, that Defendants stipulated that the document now known to be Operating Agreement III was in effect at closing. (Defs.' Statement of Mat. Facts ¶ 2 (citing Operating Agreement III, Doc. 48, Ex. 20.)) Defendants should have known that Operating Agreement II was actually in effect. (See Timberlake Aff. ¶ 3; Operating Agreement II, Doc. 188 Ex. 2).

(Id. ¶ 6.)  In August 2009, NHX's members adopted Operating Agreement III, which was in place when NHX sold the Property to NHEP.  (Id. ¶ 8.)

On proximate causation, the Court's prior Order concluded that Plaintiffs could not show a causal connection between Defendants' concealment of the Electrolux Lease and their damages.  Because Plaintiffs "conced[ed] that they had no voting or management rights in NHX," the Court reasoned that "even if Defendants had told Plaintiffs about the Electrolux [Letter of Intent] and Lease, Plaintiffs had no way to influence Defendants' decision to sell the Property . . . ."  (Order, Doc. 118 at 66-67.)  The Court also explained that O.C.G.A. § 14-11-303(b)(3), a default rule which requires a unanimous vote among members to dispose of all or substantially all of an LLC's assets, did not help Plaintiffs because neither Raiford nor BTR were members under what the parties' stipulated was the valid operating agreement.  (Id. at 67-68.)  As explained below, Plaintiffs no longer make these concessions and, under Operating Agreement II, now argue that they could have become a member and stopped the sale.

Before embarking on an analysis of the parties' rights under the various operating agreements, the Court pauses to recall the overall question: whether Defendants' concealment of the Electrolux Lease proximately caused Plaintiffs' injury.  As explained below, under the newly discovered Operating Agreement

II, Plaintiffs have an elaborate step-by-step theory as to how they could have blocked NHX's sale of the Property had they known of the Electrolux Lease. Unlike a typical proximate cause analysis, here the Court focuses on whether Plaintiffs were empowered under the operating agreements to take the steps necessary to stop NHX from selling the Property to NHEP.

### 2. Plaintiffs' Argument

The following constitutes Plaintiffs' argument for how they could have prevented NHX from selling the Property to NHEP. The Court acknowledges, but, for the moment, does not address Defendants counterarguments to Plaintiffs' individual points.

Plaintiffs premised their argument on Raiford's ability to elect to become a member under Article VI of Operating Agreement II. Under Operating Agreement II and the Second Amended Sales Agreement, REES Holdings, LLC assigned Raiford a 15% "Interest"[3] in NHX. (See Operating Agreement II, Doc. 188 Ex. 2 art. I; Second Amended Sales Agreement, Doc. 48 Ex. 22 ¶ 4.) Because Raiford held an "Interest," he was an "Interest Holder."[4] And because REES Holdings assigned its interest to him, Raiford was

---

[3] An "'Interest' means a Person's share of the Profits and Losses of, and the right to receive distributions from, the Company." (Operating Agreement II, Doc. 188 Ex. 2 art. I.)

[4] An "'Interest Holder' means any Person who holds an Interest, whether as a Member or as unadmitted assignee of a Member." (Operating Agreement II, Doc. 188 Ex. 2 art. I.)

a transferee "entitle[d] . . . to become a Member[5] and exercise any rights of a Member" at his option. (Doc. 118 Ex. 2 art. VI.)[6] Plaintiffs assert that if Defendants had revealed the Electrolux Lease, Raiford would have elected to become a member.

Plaintiffs then turn to how Raiford, as a member, could have stopped the sale. In contrast to Operating Agreement III, which requires a supermajority vote for NHX to sell all or substantially all of its assets (Doc. 118 Ex. 3 art. 5.1.2.14), Operating Agreement II does not specifically address the power of the directors or managers to do so. Because Operating Agreement II does not provide otherwise, O.C.G.A. § 14-11-308(b)(3) requires "the unanimous vote or consent of the members" to sell, exchange, lease, or transfer "all or substantially all of the assets of the limited liability company." O.C.G.A. § 14-11-308(b)(3). Once a member, Plaintiffs assert that Raiford would have withheld consent to sell the Property, NHX's lone asset, to NHEP.

---

[5] "Member" is defined as "each Person signing this Agreement and any Person who subsequently is admitted as a member of the Company." (Operating Agreement II, Doc. 188 Ex. 2 art. I.)

[6] In full, Article VI of Operating Agreement II provides:

6.1 *Transfers.* An Interest Holder at any time and from time to time may Transfer all or any portion of the Interest Holder's Interest. The Transfer of all or a portion of an Interest entitles the transferee to become a Member and to exercise any rights of a Member. (Doc. 188 Ex. 2 art. VI.)

12

Finally, because Operating Agreement III, which NHX's members adopted in August 2009, eliminates Raiford's entitlement to become a member and requires a supermajority vote, Plaintiffs must demonstrate why that agreement is without effect. Plaintiffs provide three explanations. First, Plaintiffs argue that, as assignees of REES Holdings, LLC, they succeeded to the "enforceable rights," see O.C.G.A. § 14-11-101(18), held by REES. (Pls.' Br., Doc. 189 Ex. 1 at 13.) "Enforceable rights," Plaintiffs claim, cannot be eliminated by amendment because, if so, they would not be enforceable in any meaningful sense. Second, Plaintiffs make a related argument that they possessed the same enforceable rights as third party beneficiaries of Operating Agreement II. (Id. at 14 (citing O.C.G.A. § 9-2-20(b))). Finally, drawing from corporate law, Plaintiffs argue that these two rights, what the Court will refer to as "membership" and "unanimity," are "vested rights" that cannot be impaired by bylaw amendments. (Id. at 15-16.) Based on these three arguments, Plaintiffs believe Operating Agreement III was without effect as to Raiford.

### 3. Analysis

As the above description shows, resolving Plaintiffs' theory of proximate causation involves at least five sub-questions: (1) what Operating Agreement was in effect when BTR and NHX closed the sale of the Property?; (2) was BTR an

"Interest Holder" under Operating Agreement II?; (3) could BTR have unilaterally become a Member at its election?; (4) did NHX's adoption of Operating Agreement III eliminate BTR's power to become a member?; (5) and, if not, could Plaintiffs have stopped the sale? Plaintiffs and Defendants have persuasive arguments on each of these individual points.

For the purpose of providing context for the remaining discussion, the following assumptions are made. First, when BTR and NHX closed on the Property, Operating Agreement II was in effect. (Abernathy Aff., Doc. 195 Ex. 1 ¶¶ 5-6.) Second, the "15% equity ownership" interest transferred to BTR constituted an "Interest" and made BTR an "Interest Holder" as those terms are defined in Operating Agreement II. (See Second Amended Sales Agreement, Doc. 48 Ex. 22 ¶ 4; Operating Agreement II, Doc. 188 Ex. 2 art. I. But see Action of the Sole Member of NHX, Doc. 197 at 8-9 (REES Holdings, LLC purporting to assign a 100% of its "Ownership Percentages" in NHX to Snellville Crossing, LLC.[7])) Third, Article VI of Operating Agreement II allowed BTR to become a member at its election and without the Manager's approval. (See Operating Agreement II, Doc. 188 Ex. 2 art. VI. But see id. art. 5.1.2.14.)

---

[7] Presumably Snellville Crossing later assigned parts of its interest to Defendants Richard Swope and Ronald DeThomas who were listed as shareholders on Operating Agreement III. (Operating Agreement III, Doc. 188 Ex. 4 at 21.) Those assignments do not appear to be on the record.

Below, the Court focuses its discussion on questions four and five: (4) did NHX's adoption of Operating Agreement III eliminate BTR's power to become a member?; (5) and, if not, could Plaintiffs have stopped the sale? Both of these questions ask the Court to consider whether Operating Agreement III was effective against Plaintiffs.

### a. "Enforceable Rights" as an Assignee

Plaintiffs first argued that Raiford's entitlement to become a member under Article VI of Operating Agreement II and the unanimity rule were "enforceable rights" under O.C.G.A. § 14-11-101(18). That section states that "[a]n operating agreement may provide enforceable rights to any person, including a person who is not a party to the operating agreement, to the extent set forth therein." O.C.G.A. § 14-11-101(18).

Plaintiffs mistake the meaning of an enforceable right in this context. It is true that bylaws may create enforceable rights and that Georgia courts are available for members of LLCs to enforce them. But there is nothing inconsistent with a definition that provides that bylaws are enforceable while still noting they are amendable. For an obvious comparison: many statutes are enforceable through private rights of action, but legislatures may still amend them. On the other hand, the Supreme Court of Georgia has long held that Georgia's

15

Constitution prohibits the enactment of retroactive laws that impair "vested rights." See Deal v. Coleman, 751 S.E.2d 337, n.13 (Ga. 2013) (discussing the historical prohibition on retroactive legislation). But the term "enforceable" does not possess the same meaning as, for example, "vested." Black's Law Dictionary defines "enforce" as "[t]o give force or effect to (a statute, etc.); to compel obedience to." *Enforce*, Black's Law Dictionary 645 (10th ed. 2014). By comparison, "vested" is defined as "[h]aving become a completed, consummated right for present or future enjoyment; not contingent; unconditional; absolute." Id. at 1794. These terms are not synonymous. The Court concludes that O.C.G.A. § 14-11-101(18) has no bearing on whether NHX may permissibly amend the bylaws in question. Plaintiffs' argument that they have unamendable rights is better considered under the "vested rights" doctrine discussed below.

### b. "Enforceable Rights" as Third-Party Beneficiary

Plaintiffs' second argument focuses on their alleged status as a third-party beneficiary of Operating Agreement II. Just as in traditional contracts, bylaws can create enforceable rights in third-parties. O.C.G.A. § 14-11-101(18). Though vague, on the third-party issue, Plaintiffs' argument appears to be that they gained the same enforceable rights discussed above, not as assignees, but as intended beneficiaries under Operating Agreement II.

This argument fails for three reasons. First, just as above, O.C.G.A. § 14-11-101(18) allows bylaws to create enforceable rights, but says nothing about those rights being unamendable. Second, based on their arguments here and the lack of evidence presented, Plaintiffs cannot show that they are the intended beneficiaries of Operating Agreement II because Georgia law requires that "the contracting parties' intention to benefit the third . . . be shown on the face of the contract." Brown v. All-Tech Inv. Group, Inc., 595 S.E.2d 517, 524 (Ga. Ct. App. 2003). Finally, to the extent that Plaintiffs' argument is that a generic "Interest Holder" is the intended beneficiary and that they simply gained the rights possessed by an Interest Holder when they received the rights as assignees, that argument fails because it just collapses into their argument discussed above.

### c. "Vested Rights" Doctrine

Finally, Plaintiffs argue that Operating Agreement II impairs BTR's vested right to become a member and to the unanimous voting requirement. (Doc. 189, Ex. 1 at 15-17). The continuing relevance of the vested-rights doctrine is somewhat in doubt. Some courts point to a general trend away from using the language of "vested rights" coinciding with the adoption by many states of the Model Business Corporations Act. Black v. Glass, 438 So.2d 1389, 1370 (Ala. 1983) (citing Dentel v. Fidelity Savings & Loan Ass'n., 539 P.2d 649 (Or. 1975); 8

Fletcher Cyc. Corp. § 4177.10. Though Georgia courts appear to have not considered the vested-rights doctrine in decades, there remains authority for its existence that have not been questioned by Georgia courts. The Court does, however, find it curious that courts have not cited these authorities since the legislature enacted its first Business Corporations Code in 1968. Further, Georgia appears to have never addressed vested rights in the context of an LLC. Nevertheless, the Court assumes the doctrine applies to LLCs to the same extent that it would to corporations.

Georgia cases discussing vested rights occur in the general context of a contractual relationship that incorporates the contracting business entities' bylaws into the agreement or where withdrawal rights are concerned.[8] The leading Georgia case on vested rights is Interstate Bldg. & Loan Ass'n v. Wooten, 38 S.E. 738 (Ga. 1901). There, a building and loan association brought suit against one of its members for breach of her loan agreement. When the member took out her loan, which

---

[8] See Interstate Bldg. & Loan Ass'n v. Wooten, 38 S.E. 738 (Ga. 1901) (building and loan association); Crittenden v. S. Home Bldg. & Loan Ass'n, 36 S.E. 642 (Ga. 1900 (same); Georgia Masonic Mut. Life Ins. Co. v. Gibson, 52 Ga. 640 (1874) (mutual life insurance company); Helmly v. Schultz, 131 S.E.2d 924 (Ga. 1963) (plaintiff alleged vested right in bylaw requiring selling shareholder to first offer shares to other shareholders); see also 18A Am. Jur. 2d Corporations § 266 (listing example impairments including those "impacting plans of insurance, altering consideration to be received upon redemption of shares, or altering the right to receive upon termination of a membership the fair book value of the member's shares").

incorporated the association's bylaws, she was required to pay back the loan in 84 monthly installments. Id. at 739. Later, she sought to settle the balance of her loan, but the association refused and required her to pay the loan back in compliance with an amended bylaw requirement of 98 monthly installments. Id. Because she considered this a breach, the defendant stopped paying, leading the association to bring suit. Id.

The Supreme Court of Georgia stated that "although a corporation has the power of amending its by-laws, yet, inasmuch as they enter into and form a part of the contracts it makes with its members, they cannot, under the guise of amending its by-laws, impair the obligations of such contracts." Id. In the context of a building and loan association, the Supreme Court of Georgia analogized the member paying back her loan to withdrawing from an association and held that the ability to pay back the loan and thus withdraw from the association was a vested right that an association cannot deny a member of without their consent. Id. The court noted, however, that "amendments which do not increase [her] obligations but provide a different method of withdrawing, are valid." Id. (internal quotations omitted).

Other Georgia cases have recognized the distinction between amendments that affect "vested rights" and those that "relate to the plan upon which its businesses shall be transacted."

19

<u>Wooten</u>, 38 S.E. 738, 741 (citing <u>Georgia Masonic Mut. Life Ins.</u> <u>Co. v. Gibson</u>, 52 Ga. 640, 641 (1874) (finding that by-law amendment changing a notice procedure "only regulated the proceedings of the company" and "did not annex any new condition to the [insurance] policy")); Most states appear to apply similar rules. <u>See</u> <u>Black v. Glass</u>, 438 So.2d 1359, 1371 (Ala. 1983); 8 Fletcher Cyc. Corp. § 4177.10 ("Bylaws that merely regulate the general administrative policies and affairs of the corporation, the course and forms of procedure in the conduct of its affairs, the relations of the members and officers with the corporation and among themselves, and similar internal matters, are a proper and valid exercise of the power."). Moreover, recent statutory enactments, though not determinative, are persuasive as to what constitutes a vested right. Beginning in the LLC context, Georgia provides that an interest in a limited liability company constitutes a property interest. O.C.G.A. § 14-11-501. The Code does not mention whether a member has a property interest in any particular way an LLC governs itself. Additionally, the Georgia Business Corporation Code expressly disclaims the view that a corporation's articles of incorporation vest rights relating to "management, control, capital markets, dividend entitlement, or purpose or duration of the corporation." O.C.G.A. § 14-2-1001.

Georgia's vested-rights cases and its more recent statutory enactments appear to reflect the following dichotomy: Vested

rights are those related to a member or shareholders' economic interest in a business entity, including the members' ability to withdraw their economic interest. Conversely, bylaws regulating who may become members, how many members are needed to take action, and the distribution of responsibilities between managers and members, just regulate how the business conducts its affairs. The Court finds that this distinction is consistent with earlier case law and modern statutes. Below, the Court considers whether each of the bylaws in question (membership under Article VI of Operating Agreement II and the implied unanimous voting requirement from O.C.G.A. § 14-11-303(b)(3)) grant vested rights or merely regulate the NHX's activities.

Applied in this case, Plaintiffs did not have a vested right in becoming a member. The Court has assumed that Article VI of Operating Agreement II entitled Plaintiffs, as an assignee of an Interest Holder, to become a member at their election. Elsewhere, the operating agreement granted discretion to NHX's manager to admit new members. In cases where an Interest Holder assigns its interest to another, that person may become a member. (Operating Agreement II, Doc. 188, Ex. 2 art. VI) In seemingly all other cases, the discretion to admit new members lies with the manager. (Id. art. 5.1.2.14.) These bylaws merely distribute the power to control membership. Accordingly,

the enforceable rights provided in Article VI were not "vested rights" and could be amended without Plaintiffs consent.

Additionally, the unanimous voting requirement, which, after all, is only implied as a default rule by O.C.G.A. § 14-11-303(b)(3), is also not a vested a right, and, therefore, Operating Agreement III's supermajority voting provision applies. (Operating Agreement III, Doc. 188 Ex. 3 § 5.5(f)). As mentioned above, courts distinguish between bylaws that regulate the internal affairs of the corporation, and those that vest rights. An amendment requiring a supermajority vote for NHX to take certain actions, including disposing of all of its assets, falls into the regulatory category. See O.C.G.A. § 14-2-1001(b) (providing that, in the context of a corporation, shareholders "do[] not have a vested property right resulting from any provision in the articles of incorporation, including provisions relating to *management* [and] *control* . . . ." (emphasis added)). Because the amendment requiring a supermajority was effective and the Individual Defendants together would constitute a supermajority, Plaintiffs could not have stopped NHX from selling the Property. Plaintiffs, therefore, cannot show proximate causation.

Though the analysis above is different than the March 27, 2013 Order, the conclusion remains the same: Plaintiffs fail to show a causal connection between Defendants' alleged fraud and their injury. Summary judgment was therefore properly granted

22

in Defendants' favor, and the Court **DENIES** Plaintiffs' motion
for reconsideration on Count II. (Doc. 189.)

### C. Reconsideration of the Court's Grant of Summary Judgment on Plaintiff's Claim for Equitable Relief

Plaintiffs argue that the Court's Order dismissing their
count for specific performance constituted clear error and would
work a manifest injustice and therefore warrants
reconsideration. (Doc. 184, Ex. 1 at 1.) As a matter of
substantive law, in their view, the Court erred in finding that
an adequate remedy at law existed because NHX, the only
remaining Defendant on their breach-of-contract claim, has no
assets and no value. Moreover, as a procedural matter, they
argue that the Court erred in considering the adequacy of legal
remedies as a basis for dismissal because Defendants did not
raise that issue, and they lacked the requisite notice to argue
that damages were inadequate.

Count IV of Plaintiff's Complaint is titled "Specific
Performance," and requests the following relief:

31. Alternatively, Plaintiffs are entitled in equity to a 15%
    interest in the new limited liability company to which
    the Center has been transferred, without any accompanying
    financial responsibility.

32. Plaintiffs are entitled to an injunction requiring
    Defendants to convey such an interest in the new limited
    liability company to Plaintiffs.

(Compl., Doc. 1 ¶¶ 31-32.) In other words, Plaintiffs sought
damages in this case and, if no damages could be had, requested

equitable relief requiring Defendants to convey a 15% interest in NHEP to Plaintiffs.

Although Defendants moved for summary judgment on Count IV, both parties' briefing on Count IV was sparse. In their opening brief, Defendants led with the relevant statutory provision concerning specific performance. See O.C.G.A. § 23-2-130 ("Specific performance of a contract, if within the power of the party, will be decreed, generally, *whenever the damages recoverable at law would not be an adequate compensation for nonperformance*." (emphasis added)). But their argument focused solely on Plaintiff's lack of a contractually enforceable right to a 15% interest in NHEP or 2701 Partners. (Doc. 48 at 8.) Likewise, in their reply brief, Defendants argued that "[t]here is no specific performance to which Plaintiffs are entitled that would create an ownership interest or profits where none exists." (Doc. 194 at 17.)

Plaintiffs recognized this as "Defendants' sole argument for summary judgment on this count." (Doc. 80 at 18.) In response, Plaintiffs argued that they "seek performance of the agreement of purchase and sale whereby Plaintiffs' became a 15 percent member in the entity that owned the Shopping Center" because the "alleged sale of the Shopping Center to Harrell was a sham transaction that should be disregarded." (Id. at 19.) The above was the extent of the discussion regarding Count IV during the summary-judgment briefing.

In the Order, the Court summarized Defendants' arguments as "(1) Plaintiffs still own 15% of NHX, and there is no contractual right for the Court to enforce, and (2) damages at law constitute an adequate remedy and preclude specific performance." (Order, Doc. 118 at 71.) To be sure, Defendants quoted the relevant statutory language that discusses the adequacy of legal remedies. But, upon further consideration, the Court considers a reference to the statute, absent any legal argument, insufficient to raise adequacy of legal remedies as a ground for dismissal. Moreover, on their briefing on reconsideration, Defendants have not attempted to defend the Court's ruling with any suggestion that they raised the adequacy of damages before; instead, they have reargued their point about the lack of a contractually enforceable right to an interest in NHEP or 2701 Partners. The Court, therefore, concludes that Plaintiffs lacked the requisite notice to address the adequacy of legal remedies. See Byars v. Coca-Cola Co., 517 F.3d 1256, 1264-67 (11th Cir. 2008); Karlson v. Red Door Homes, LLC, 553 F. App'x 875, 877-78 (11th Cir. 2014).

Plaintiffs are also correct that, under Georgia law, damages against an insolvent company constitutes an inadequate remedy at law. To be adequate, the remedy "must be complete and the substantial equivalent of equitable relief. It is not enough that there is a remedy at law. It must be plain and adequate or, in other words, as practical and as efficient to

the ends of justice and its prompt administration as the remedy in equity." Concrete Coring Contractors, Inc. v. Mech. Contractors & Eng'r, Inc., 141 S.E.2d 439, 442 (Ga. 1965) (quoting Atl. Coast Line R.R. Co. v. Gunn, 194 S.E. 365, 367 (Ga. 1937)). In the context of insolvency, Georgia courts are clear: "Insolvency of the defendant and inability to respond to such damages as the plaintiff might recover for breach of contract is ground for equitable intervention." Concrete Coring Contractors, 141 S.E.2d at 442 (citing Tanner v. Campbell, 184 S.E. 705, 706 (Ga. 1936)).[9]

In this case, the Court's Order recognized that NHX has no assets and is valueless. (March 27, 2013 Order, at 14, 42, 47, 66, 71.) It was error for the Court to conclude as a matter of law that contractual damages were an adequate remedy at law.

Briefly, the Court addresses the argument originally raised by Defendants and re-raised on this motion for reconsideration. Defendants have frequently pointed out that Plaintiffs have no contractual right to a 15% interest in NHEP 2701 Partners that

---

[9] Georgia's rule is also recognized by leading treatises. See 25 Williston on Contracts § 67:10 ("insolvency of the defendant affords a sufficient reason of itself or in connection with other facts for the specific enforcement of a contract to transfer personal property though apart from defendant's insolvency no right to specific performance exists") (citing, e.g., Crawford v. Williams, 99 S.E. 378 (Ga. 1919)); 12 Corbin on Contracts § 63.19 ("A money judgment against a defendant who has no property that is subject to levy and execution is not a complete and adequate remedy for an injury caused by a breach of contract."); 71 Am. Jur. 2d Specific Performance § 13 ("insolvency of the defendant may be considered along with other factors in the determination of whether the legal remedy of damages is inadequate")

this Court can enforce by specific performance. True enough. But Defendants' argument follows from too narrow an interpretation of Plaintiffs' Complaint. Defendants focus on Count IV's heading ("Specific Performance") instead of its substantive paragraphs, which request equitable relief in the form of an injunction to convey a 15% interest in the limited liability company that now controls the Property. This equitable remedy is better understood as a constructive trust and not specific performance. See Restatement (Third) of Restitution and Unjust Enrichment § 55(2) ("The obligation of a constructive trustee is to surrender the constructive-trust property to the claimant, on such conditions as the court may direct.")[10] Accordingly, Defendants' argument regarding specific performance does not entitle them to summary judgment on the requested equitable relief. That said, whether Plaintiffs will eventually be entitled to equitable relief is an open question. As this issue has been insufficiently briefed and argued to this point, the Court is not in a position to determine as a matter of law that Plaintiffs are not entitled to equitable relief.

---

[10] The Court notes that, under Georgia law, a constructive trust is a remedy to prevent unjust enrichment and not an independent cause of action. Morrison v. Morrison, 663 S.E.2d 714, 717 (Ga. 2008). The Court therefore doubts whether Count IV should be maintained as a separate Count as opposed to being a remedial request to Count I. For procedural convenience, and to make clear that Plaintiffs' requested equitable relief is reinstated, at the present time, the Court simply reinstates Count IV.

In dismissing Count IV, the Court incorrectly reasoned that Plaintiffs possessed an adequate legal remedy. The Court **GRANTS** Plaintiffs' motion (Doc. 184) and **REINSTATES** Count IV of Plaintiffs' Complaint.

### IV. CONCLUSION

As discussed above, the Court **GRANTS** Plaintiffs' motion to reinstate Count IV (Doc. 184), **DENIES** their motions to reconsider denial of Plaintiff's motion to amend (Doc. 187) and to reconsider the Court's summary judgment in favor of Defendants on Count II. (Doc. 189.)

**ORDER ENTERED** at Augusta, Georgia, this _17th_ day of May 2016.

_____
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA